### UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT

|  |  |
|---|---|
| **BARRY MORPHEW,** | |
| *Plaintiff/Appellant,* | |
| v. | **Case No. 24-1424** |
| **CHAFFEE COUNTY, COLORADO** et al., | |
| *Defendants/Appellees*, | |

On Appeal from the United States District Court for the District of Colorado
The Honorable Judge Daniel D. Domenico
District Court Civil Action No. No. 1:23-CV-01108-DDD-JPO

# OPENING BRIEF OF APPELLANT

### ORAL ARGUMENT REQUESTED

FISHER & BYRIALSEN, P.L.L.C.

/s/*Jane Fisher-Byrialsen*

Jane Fisher-Byrialsen, Esq.
4600 S. Syracuse Street, 9th Floor
Denver, Colorado 80237
Telephone: 303-256-6345
Jane@FBLaw.org

SAMLER AND WHITSON, PC

/s/ *Hollis Whitson*

Hollis Whitson, Esq.
1600 Stout Street, Suite 1400
Denver, Colorado 80202
Telephone: 303-670-0575
Hollis@SamlerandWhitson.com

*Counsel for Appellant Barry Morphew*

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

STATEMENT OF RELATED APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

CONSTITUTIONAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    A.    Defendants recklessly misidentified Plaintiff as their target. . . . . . . . 3

    B.    In their ensuing reckless investigation, defendants ignored and then conspired to hide high exculpatory information and to include false and misleading statements in the Affidavit. . . . . . . . . . . . . . . . . . . . . .5

    C.    Prosecutor Defendants continued the malicious prosecution for months, even though any probable cause had dissipated. . . . . . . . . . .8

    D.    After Plaintiff sued, the district court granted Defendants' motions to dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    Plaintiff sufficiently alleged claims for malicious prosecution, fabrication of evidence and a violation of *Franks v. Delaware*, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

        1.    Plaintiff sufficiently alleged a Warrant Clause violation . . . . .13

        2.    Probable cause is a jury issue in this case . . . . . . . . . . . . . . . . 15

3.      The corrected affidavit does not establish probable cause
        that Plaintiff killed his wife . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

4.      The Court violated the Rule of Party Presentation . . . . . . . . 26

5.      Defendants are not entitled to Qualified Immunity . . . . . . . .26

        a.      The rights were clearly established . . . . . . . . . . . . . . .28

        b.      "Arguable probable cause" cannot excuse a
                constitutional violation when a reasonable actor
                would know the misconduct was unlawful . . . . . . . . .29

6.      Absolute immunity does not apply . . . . . . . . . . . . . . . . . . . . . 35

C.      Plaintiff sufficiently alleged causation and personal
        participation for all counts, including the conspiracy count . . . . . . . 38

1.      The district court imposes too heavy a burden
         at the pleading stage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2.      Even though Walker swore to and executed the affidavit,
        that doesn't absolve other participants and co-conspirators . . 40

3.      Plaintiff sufficiently alleged a conspiracy and each
        defendant's personal participation in it . . . . . . . . . . . . . . . . . . 41

4.      Plaintiff sufficiently alleged liability of
        non-prosecutor defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

5.      The allegations about Defendant Himschoot are sufficient . . .45

D.      Plaintiff sufficiently alleged Reckless Investigation . . . . . . . . . . . . 45

E.      Plaintiff sufficiently alleged Failure to Intervene . . . . . . . . . . . . . . 48

F.      Plaintiff sufficiently alleged municipal liability . . . . . . . . . . . . . . . 49

G.     This Court should not apply the Doctrines of
       Qualified and Absolute Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

H.     This court should direct the district court to reconsider its order
       declining to exercise jurisdiction over Plaintiff's state law claims . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

REASONS FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

CERTIFICATE OF COMPLIANCE WITH WORD VOLUME LIMITATIONS 57

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

Order, September 24, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attachment A

Final Judgment, September 24, 2024 . . . . . . . . . . . . . . . . . . . . . . . . Attachment B

# TABLE OF AUTHORITIES

## CASES

*APMC, Inc. v. Fogarty*, No. 08-249, 2008 WL 4279780, at * 2 (W.D. Okla. Sept. 12, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) . . . . . . . . . . . . . . . . . .18

*Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) . . . . . . . . . . . . . . . . . . 10-11, 14, 38, 50

*Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . .55

*Bailey v. Twomey*, 791 Fed. Appx. 724, 734 (10th Cir. 2019) . . . . . . . . . . . . . . . . 29

*Baptise v. J.C. Penney, Co., Inc.*, 147 F.3d 1252, 1257 (10th Cir. 1998) . . . . . .46-47

*Baxter* v. *Bracey*, 140 S.Ct. 1862 (2020) (opinion of Thomas, J.) . . . . . . . . . .53, 55

*Behrens v. Pelletier,* 516 U.S. 299, 309 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) . . . . . . . . . . . . . .27, 43, 49-50

*Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008) . . . . . . . . . . . . . .37

*BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . .47

*Birdsong v. Unified Government of Kansas City*, No. 13-2090, 2014 WL 2216904, at *5 (D. Kan. May 29, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38-39

*Bledsoe v. Board of County Commissioners of the County of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1078, 1080 (D.Colo. Nov. 18, 2020) . . . . . . . . . . . . . . . . . . . . .39

*Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) . . . . . . . . . . . .35, 44, 42, 48

*Board of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997) . . . . . . . . . . . . . . .50

*Briggs v. Johnson*, 274 Fed. Appx. 730, 736 (10th Cir. 2008) . . . . . . . . . . . . . .38-39

*Brinegar v. United States*, 338 U.S. 160, 175 (1949) . . . . . . . . . . . . . . . . . . . . . . .25

*Briscoe v. LaHue*, 460 U.S. 325, 342 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Bruner v. Baker,* 506 F.3d 1021, 1028 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . .17

*Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008) . . . . . . . . . . . 39

*Buckley v. Fitzsimmons*, 509 U.S. 259, 261, 272-76 (1993) . . . . . . . . . . . . . . .35-37

*Burns v. Reed*, 500 U.S. 478, 486 (1991) . . . . . . . . . . . . . . . . . . . . . . . 35-37, 53-54

*Butler v. Hesch*, 286 F. Supp. 3d 337, 362–63 (N.D.N.Y. 2018) . . . . . . . . . . . . . . 29

*Chilcoat v. San Juan County*, 41 F.4th 1196 (10th Cir. 2022) . . . . . . . . . . . . . . . . 37

*Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007) . . . . . . . . . . . . . . . . . .47

*Cuervo v. Sorenson*, 112 F.4th 1307, 1314 (10th Cir. 2024) . . . . . . . . . . . . . . . . . .39

*Dawson v. Bd. of Cnty. Commissioners of Jefferson Cnty., Colorado*, No. 16-CV-01281-MEH, 2017 WL 5188341, at *11 (D.Colo. 1/3/2017), *aff'd*, 732 F. App'x 624 (10th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*DeLoach v. Bevers,* 922 F.2d 618, 623 (10th Cir.1990) . . . . . . . . . . . . . . . . . . .15, 16

*Devenpeck v. Alford,* 543 U.S. 146, 153 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) . . . . . . . . . . . 11

*Easton v. City of Boulder*, 776 F.2d 1441, 1446 (10th Cir. 1985) . . . . . . . . . . . 16-17

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) . . . . . . . . . . . . .11-12

*Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020) . . . . . 55

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) . . . . . . . .29

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . .38

*Fourth Corner Credit Union v. FRB*, 861 F.3d 1052, 1066 (10th Cir. 2017) . . . . . .13

*Fox v. Hayes,* 600 F.3d 819 (7ᵗʰ Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . .20, 22

*Franks v. Delaware,* 438 U.S. 154 (1978) . . . . . . . 1,11-12, 28, 31-34, 41-43, 46, 56

*Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) . . . . . . . . . . . . . . . . . . . .42

*Garmon v. Lumpkin Cnty., Ga.*, 878 F.2d 1406, 1410 (11th Cir. 1989) . . . . . . . . . .25

*Golino v. City of New Haven*, 950 F.2d 864, 872 (2d Cir.1991) . . . . . . . . . . . . .16, 32

*Green v. Thomas,* 734 F. Supp. 3d 532, 569 (S.D. Miss. 2024), *aff'd in part, rev'd in part,* No. 24-60314, 2025 WL 670451 (5th Cir. Mar. 3, 2025) . . . . . . . . . . . . . . . . 54

*Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) . . . . . . . . . . . . . . . . . . . . 26

*Harris v. Tioga Cnty.*, 663 F.Supp.3d 212, 240 (N.D.N.Y. Mar. 23, 2023) . . . . 35-37

*Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) (opinion of Thomas, J.) . . . . . . . . 53-54

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) . . . . . . . . . . 14

*Imbler v. Pachtman,* 424 U.S. 409, at 431, n. 33 (1976) . . . . . . . . . . . . . . . . . . . . 36

*Jacobs v. City of Chi.*, 215 F.3d 758, 775-76 (7th Cir. 2000) (Easterbrook, J., concurring in part) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27

*Janny v. Gamez*, 8 F.4th 883, 924 (10th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . .43

*Johnson v. United States,* 333 U.S. 10, 13–14 (1948) . . . . . . . . . . . . . . . . . . . . 14, 31

*Jones v. City & Cty. of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988) . . . . . . . . . .17

*Kalina v. Fletcher,* 522 U.S. 118, 126, 129-130 (1997) . . . . . . . . . . . . . . . . . . 37, 53

*Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . .16, 25

*Kartiganer v. Newman*, 450 F. App'x 713, 715 (10th Cir. 2011) . . . . . . . . . . . . . .13

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . .43

*Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . .12, 27

*Keylon v. City of Albuquerque*, 535 F.3d 1210, 1215 (10th Cir. 2008) . . . . . . . . . . .15

*Khalik v. United Air Lines*, 671 F.3d 1188, 1190-91 (10th Cir. 2012) . . . . . 10-14, 49

*Leatherman v. Tarrant Cty.,* 507 U.S. 163, 168 (1993) . . . . . . . . . . . . . . . . . . . . . . 49

*Malley v. Briggs,* 475 U.S. 335, 344-45 (1986) . . . . . . . . . . . . . . . . . . . . . . . 27, 32, 52

*Marbury v. Madison*, 5 U.S. 137, 163 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

*Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . 40

*Marshall v. Dix,* 640 F.Supp. 3d 1033 (D.Colo. 2022) . . . . . . . . . . . . . . . . . . . .36, 38

*McAlister v. Kellogg*, 637 F. App'x 518, 519 (10th Cir. 2016) . . . . . . . . . . . . . . . . 28

*McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 825–26 (2d Cir. 2014) . . . . . . . . . .30

*McCormick v. City of Chicago,* 230 F.3d 319, 325 (7th Cir. 2000) . . . . . . . . . . . . . 52

*McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) . . . . . . . . 36

*McKenzie v. Lamb*, 738 F.2d 1008, 1008 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . .17

*Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 36

*Mink v. Suthers*, 482 F.3d 1244, 1262 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 37

*Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978) . . . . . . . . . . . .49

*Monroe v. Pape*, 365 U.S. 167, 187 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Montoya v. City & Cnty. of Denver,* 21-1107, 2022 WL 1837828, at *8 (10th Cir. June 3, 2022)(unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 44, 52

*Morse v. Fusto*, 804 F.3d 538, 547–48 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . 36

*Munchinski v. Solomon,* 747 F. App'x 52, 60 (3d Cir. 2018) . . . . . . . . . . . . . . . . .38

*Odd v. Malone,* 538 F.3d 202, 210-11 (3d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . .36

*Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . .27

*Payton v. New York,* 445 U.S. 573, 586 n. 24 (1980) . . . . . . . . . . . . . . . . . . . . . . . .14

*People v. Linda Stanley*, 559 P.3d 697 (Colo. O.P.D.J. 2024) . . . . . . . . . . . .9 n. 3, 47

*Peterson v. Jensen,* 371 F.3d 1199, 1201 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . 26

*Pierce v. Gilchrist*, 359 F.3d 1279, 1296, 1298 (10th Cir. 2004) . . . . . . . . . 11, 28, 40

*Pierson v. Ray*, 386 U.S. 547 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Procunier v. Navarette*, 434 U.S. 555, 562 (1978) . . . . . . . . . . . . . . . . . . . . . . . .52-53

*Rainsberger v. Benner*, 913 F.3d 640, 652 (7th Cir. 2019) . . . . . . . . 14-15, 20, 31-32

*Rehberg v. Paulk*, 566 U.S. 356, 366 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Richardson v. McKnight*, 521 U.S. 399, 415-16 (1997)(Scalia, J., dissenting) . . . . 53

*Rivers v Ex-Cell-O Corp*., 100 Mich App 824, 300 N.W.2d 420 (1980) . . . . . . . . .25

*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) . . . . . . . . . . . . . 10, 39

*Roemer v. Bd. Regents*, NMSU, No. CIV 22-0524 JB/JHR, 2025 WL 641228, at *54 n. 94 (D.N.M. Feb. 27, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

*Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023)(Willett, J., concurring) . . . . . .52

*Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . .47

*Sanchez v. Hartley*, 810 F.3d 750, 755-58 (10th Cir. 2016) . . . . . . . . . . . . . . . .11, 28

*Sanservino v. Chrostowski*, 536 F. App'x 62, 64 (2d Cir. 2013) . . . . . . . . . . . . . . .16

*Shaw v. Schulte*, 36 F.4th 1006, 1020 (10th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . 48

*Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir.2009) . . . . . . . . . . . . . . . 15, 25

*Siehl v. City of Johnstown*, 365 F. Supp. 3d 587, 598 (W.D. Pa. 2019) . . . . . . . . . .38

*Sledd v. Lindsay,* 102 F.3d 282, 288–289 (7th Cir.1996) . . . . . . . . . . . . . . . . . . . 52

*Smalls v. Collins,* 10 F.4th 117, 133 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . .12

*Stewart v. Donges,* 915 F.2d 572, 582 n. 13 (10th Cir.1990) . . . . . . . . . . . . . . . . . .12

*Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) . . . . . . . . . . . . 17, 29, 35

*Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . .12

*Taylor v. Rioja*s, 592 U.S. 7, 7-9 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Tolan v. Cotton,* 572 U.S. 650, 657 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Truman v. Orem City*, 1 F.4th 1227, 1236 n. 5 (10th Cir. 2021) . . . . . . . . . . 10, 12, 36

*Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Brown,* 289 F.3d 989, 994 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . .25

*United States v. Lanier,* 520 U.S. 259, 270-271 (1997) . . . . . . . . . . . . . . . . . . .47, 48

*United States v. Leon,* 468 U.S. 897, 923 (1984) . . . . . . . . . . . . . . . . . . . . . . 11, 32-33

*United States v. Little*, 119 F.4th 750, 770 (10th Cir. 2024) . . . . . . . . . . . . . . . . . . .10

*United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) . . . . . . . . . . . . . . . . . . 26

*United States v. St. Clair*, 855 F.2d 518, 523 (8th Cir. 1988) . . . . . . . . . . . . . . .24, 25

*United States v. Tanguay,* 787 F.3d 44 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . .46

*Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009) . . . . . . . . . . . . . . . . . . . . . . . 36

*Walczyk v. Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) . . . . 33

*Walker v. Zepeda,* No. 111CV01242DMECBS, 2012 WL 13285403, at *5 (D. Colo. 5/29/2012) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49-50

*Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . .26

*Whitson v. Bd. of Cnty. Commissioners of Cnty. of Sedgwick*, 106 F.4th 1063, 1067 (10th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

*Wilkins v. DeReyes*, 528 F.3d 790, 801-801 (10th Cir. 2008) . . . . . . . . . . . . . . . . . 29

*Wilson v. City of Chicago,* No. 09 C 2477, 2009 WL 3242300, at *3 (N.D. Ill. 10/7/2009) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

*Wolford v. Lasater*, *supra* 78 F.3d 484, 489 (10th Cir.1996) . . . . . . . . . . . . . .11, 12

*Zadeh v. Robinson*, 928 F.3d 457, 480-81 (5th Cir. 2019) (Willet, J., dissenting) . .54

*Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . .36

*Ziglar v. Abbasi*, 582 U.S. 120, 158-60 (2017) (Thomas, J., concurring) . . . . . 53, 54

## **CONSTITUTION, STATUTES AND RULES**

28 U.S.C. § 1367(c)(1), (2) & (4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42-43, 52

Fed. R. Civ. P. 8(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 38-39

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 10, 17, 18, 26-27

Pub. L. 42-22, ch. 22, § 1, 17 Stat. 13 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

U.S. Const., Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,14,31

## **OTHER AUTHORITY**

William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018) . . 54

Karen Blum, *Qualified Immunity: Time to Change the Message*, 93:5 Notre Dame L. Rev. 1887, 1888-92 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Alexander Reinert, Qualified Immunity's Flawed Foundation, 111 Cal. L. Rev. 201, 235 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

Joanna Schwartz, The Case Against Qualified Immunity, 93:5 Notre Dame L. Rev. 1798, 1800 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53-54

## RELATED CASES

None.

## JURISDICTION

The district court had subject-matter jurisdiction over Plaintiff-Appellant ("Plaintiff")'s constitutional claims asserted under 42 U.S.C. § 1983, for which 28 U.S.C. § 1331 confers jurisdiction. On September 24, 2024 the court granted Defendants-Appellees ("Defendants")'s motion to dismiss under Fed. R. Civ. P. 12(b)(6) and entered judgment. App. Vol. 3, pp. 833 ("*Order*"), 866.  Jurisdiction is proper under 28 U.S.C. § 1291.

## ISSUES PRESENTED

(1) Whether Plaintiff sufficiently alleged claims for malicious prosecution, fabrication of evidence, *Franks* Warrant Clause violations,[1] conspiracy, failure to intervene, and *Monell* liability by deciding the question of probable cause, which was a jury question under the circumstances of this case. (*Order,* App. Vol. 3, pp. 844-852).

(2) Whether after "correcting" the affidavit pursuant to *Franks,* the corrected affidavit would have established probable cause. (*Ibid*).

(3) Whether Plaintiff sufficiently alleged causation and personal participation in the conduct that caused the constitutional violations, including for the

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978)("*Franks*").

conspiracy count. (*Id*., pp. 852-856, 858-860).

(4)  Whether the court erred in granting qualified immunity even though defendants violated clearly established law when any reasonable actor would have known their action and/or failure to intervene would cause violations of Plaintiff's constitutional rights. (*Id*., pp. 856-859).

(5)  Whether the district court erred in dismissing Plaintiff's *Monell* claims even though Plaintiff plausibly pleaded that final policymaker John Spezze caused the violations of Plaintiff's constitutional rights. (*Id*., pp. 863).

(6)  Whether the doctrines of absolute and qualified immunity should be abolished. (*Id*., pp. 858 n. 11, p. 865).

(7)  Whether if this Court reverses the district court's dismissal of any of the federal claims, it should instruct the district court to consider reinstatement of the state law claims. (*Id*., pp. 864).

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…."

> "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation ...."

## STATEMENT OF THE CASE

Suzanne Morphew of Maysville, Colorado disappeared on Mother's Day, May 10, 2020.  App. Vol. 1, pp. 36-37 ¶53 ("*Complaint*"). A year later, her husband (Plaintiff Barry Morphew) was charged with murder.  Shortly before trial, the charges were dismissed without prejudice. *Id*., p. 163. Morphew filed a Civil Complaint alleging violations of 42 U.S.C. § 1983 and Colorado state law claims. *Id.*, p. 24.  The district court dismissed the lawsuit without prejudice. App. Vol. 5, pp. 833, 866. This appeal followed. *Id*., p. 868.

### A. Defendants recklessly misidentified Plaintiff as their target.

Plaintiff Barry Morphew last saw Suzanne in bed sleeping as he woke early to go to a pre-planned landscaping job in Broomfield, Colorado. *Complaint,* App. Vol. 1, pp. 36-37 ¶¶55-56, pp. 143-144 ¶¶748-759. Their daughters were on a pre-planned camping trip.  *Id*., p. 37 ¶57. When she could not be reached during the day, the Chaffee County Sheriff's Department ("CCSD") initiated a search. The Morphew family returned and joined the effort. *Id*., pp. 37-39 ¶¶58-62, 68-69. CCSD deputies located Suzanne's bike in a ravine off the side of the road and found her helmet nearby. *Id*., pp. 38-40, ¶¶62, 77.  During times pertinent to this case, Suzanne's remains were not

3

found.[2]

The elected Sheriff, CCSD personnel, the elected District Attorney ("D.A.") Linda Stanley and Deputy D.A. Jeff Lindsey, lead investigator CBI Agent Joseph Cahill, and other defendants all immediately targeted Plaintiff as the perpetrator. *Id.*, p. 40 ¶¶78-80.  When investigators discovered that, for two years, Suzanne had been having a secret, romantic affair, defendants theorized that Plaintiff must have discovered the affair on the afternoon of May 9 (because Suzanne had telephoned her lover before Plaintiff returned home from work), flew into a rage, chased his wife around outside the house, shot and killed her by shooting her with animal tranquilizer shot from a gun, disposed of her remains near their home without a trace, and then "staged" her bike to make it look like a stranger abduction. *Id.*, pp. 40-41, 50-51 ¶¶81-85, 88, 147-155.

Defendant-investigator Alex Walker swore to an Affidavit for an Arrest Warrant ("Arrest Affidavit"). He co-authored the affidavit with Stanley and Lindsey, Sheriff John Spezze and Undersheriff Andrew Rohrich, CBI Lead Investigator Agent Joseph Cahill and Agents Kirby Lewis and Dereck Graham, two FBI Agents who are not presently defendants in this lawsuit, and plausibly

---

[2] During the criminal case, Suzanne's remains were not found. On September 23, 2023, during pendency of this civil case, her remains were found near the town of Moffat in Saguache County, Colorado.

others whose identities cannot be known until after discovery. *Id.*, pp. 49-50, ¶¶140-146. For ease of reference, the Complaint often refers to these eight defendants as those "authoring the arrest affidavit." *Id.*, p. 49 ¶140.

**B. In their ensuing reckless investigation, defendants ignored and then conspired to hide highly exculpatory information and to include false and misleading statements in the Affidavit.**

Defendants recklessly and/or knowingly failed to follow legitimate investigative leads that would exculpate Plaintiff. E.g., *Complaint*, App. Vol. 1, pp. 146-147 ¶¶768-776. They withheld information and made false statements in the Arrest Affidavit, including:

- A scent dog detected a Suzanne's scent leading away from Suzanne's bike, which contradicted the false theory that Plaintiff "staged" the bike and the helmet, *Id.*, pp. 39, 107-109 ¶¶71-73, 497-511.

- The Affidavit omitted the highly exculpatory fact that cadaver and scent dogs hadn't alerted at numerous locations around and in the Morphew home. *Id.*, pp. 133-137 ¶¶673-708.

- Unknown male DNA was discovered on Suzanne's bike, helmet, locations in the Morphew home, and locations in Suzanne's car that Defendant Cahill determined to be connected with the offense. This DNA was tested against almost 70 people (including all those working on the case), to no avail. The partial genetic profiles were uploaded into CODIS. In October-November 2020, CBI Defendants Rogers and Duge learned of two CODIS matches to two different unsolved sex offenses in Arizona. That information was relayed by at least December 4, 2020 to Defendants Cahill, Walker, Rohrich, and Graham (and others not presently sued). *Id.*, pp. 41, 43-44 ¶¶91, 99-107. In April 2021, CBI defendants Rogers and Duge were made aware of another

5

CODIS match from Suzanne's car to another unsolved sex offense in Illinois. *Id*., pp. 41-44, 52-61 ¶¶91, 99-107, 158-213. None of this highly exculpatory material was included in the Arrest Affidavit. *Id*., pp. 44, 56, 58-60, ¶¶108, 175, 179, 198-210. Even excluded was the fact that there was an ongoing DNA investigation. *Id*., p. 60 ¶209.

● The Arrest Affidavit falsely stated that Suzanne's bike and helmet "were not indicative of Suzanne being a runaway or the victim of a stranger abduction." *Id*., pp. 59-60 ¶¶204-206. That statement is proven false by the omitted information about DNA and the scent dog search results.

● The Arrest Affidavit stated that technical evidence (GPS locations from Barry's phone) showed he was chasing Suzanne around their home at 2:44-2:45 p.m. *Id*., pp. 61, 68-69 ¶¶214, 246-252. The Affidavit attaches a map ("the pushpin map") purporting to show scientific/technical proof (*Id*., pp. 61-62 ¶¶216-217):



● Defendants authoring the arrest affidavit made up this depiction, drawing the lines and placing the pushpins themselves. *Ibid*. They knew this depiction ("the pushpin map") was false and misleading because almost a year before, on June 2, 2020, Defendant Cahill had received an email and an FBI technical report debunking the technical theory and alerting Cahill no reliable scientific data backed up the

theories Cahill and the others later included in the Arrest Affidavit. *Id.*, *Id.*, pp. 61-64 ¶¶218-230.  This scientific report and its findings were omitted from the Arrest Affidavit and concealed from Plaintiff's attorneys until late January 2022. *Id.*, p. 64 ¶230. It appears Defendant Cahill expressly warned some co-conspirators (including Graham, Rohrich, Lindsey, Walker) but not others (Stanley is missing from that list). *Id.*, p. 65 ¶236.

● Similar false, misleading and unreliable phone data was conveyed to support wild claims about Plaintiff's phone activity, whether it was on "airplane mode" at certain times, and the route Plaintiff supposedly took to the Broomfield job location. E.g., *id.*, pp. 65-75 ¶¶237-245, 253-287.

●  The affidavit includes false claims that there was no indication Suzanne was alive after 2:30 p.m., and claimed her call with her lover was terminated "abruptly", when in fact there was activity on her phone well into the evening and on the morning of May 10, 2020, and defendants knew the call was terminated because her lover's family returned home and he needed to hang up.  E.g., *id.*, pp. 69-75, 80-81 ¶¶253-287, 313-323. They also omitted exculpatory information that her computer showed activity late into the night and the next morning and that contrary to their claims, Suzanne had been using her computer, changing passwords, and initiating friend requests.  *Id.*, pp. 81-86 ¶¶ 324-356.

● The Complaint alleges false and misleading statements were made about "activity" on Plaintiff's truck on May 10th in the early morning, including the false statement that there were "80 events" when at most there were 18. *Id.*, pp. 87-89 ¶¶357-373.  False statements about the mileage on Plaintiff's truck were included and critical details about a trip he took to the spa store were omitted. *Id.*, pp. 110-112 ¶¶512-525.

● Critical details about Plaintiff's hotel room were omitted while misleading inculpatory claims about a chlorine smell were included. *Id.*, pp. 112-114 ¶¶526-539.

● The Affidavit falsely alleges there was "suspected blood" near the garage, but defendants knew forensic tests had ruled out that the stain was blood. *Id.*, pp. 120-121 ¶¶584-590.

- Additional material false and misleading statements were included, and material exculpatory information omitted, from the Affidavit. These were detailed in the Complaint, e.g., *id*., pp. 137-145 ¶¶709-763.

Additional false, misleading and omitted information is detailed, *infra,* in a chart responding to the district court's opinion that probable cause was established in the Arrest Affidavit.

### C.  Prosecutor Defendants continued the malicious prosecution for months, even though any probable cause had dissipated.

Plaintiff alleged that Defendant Mark Hurlbert joined the prosecution team, became aware there was no probable cause and that information that had been presented to the court was untrue or at best misleading, and that he continued the prosecution with Defendants Stanley, Lindsey, and the non-prosecutor defendants. *Complaint*, App. Vol. 1 pp. 151-152, 156-163 ¶¶804-814, 834-878. *See also id*., pp. 45-49, 52 ¶¶111-137, 159. Defendant prosecutors conspired with the non-prosecutor defendants to hide evidence and violate non-discretionary court orders to provide emails and other exculpatory information to Plaintiff's attorneys. *Ibid*.

### D. After Plaintiff sued, the district court granted Defendants' motions to dismiss.

After Plaintiff voluntarily dismissed some parties, the others all filed motions to dismiss. App. Vol. 2, pp. 338, 357, 379, 395, 443, 474; App. Vol. 3, p.

491.  Plaintiff opposed those motions. App. Vol. 3, pp. 515-654. In its order of

dismissal, the district court found the allegations showed a "wrongful" conduct that

"undermine[d] the criminal justice system in serious ways." App. Vol. 4, p. 843.

Observing the elected district attorney has been disbarred,[3] the court found "[t]here

should be, and are, consequences for that conduct." *Ibid*. But because the court

believed "there was still probable cause," the claims "must be dismissed." *Ibid*. See

*id*., pp. 864-865.

### SUMMARY OF ARGUMENT

Because Plaintiff's allegations satisfied the low "plausibility" bar at the

pleading stage, the district court should not have removed the issue of probable

cause from the jury. The district court credited speculation and suspicions about

Plaintiff's guilt, rather than accepting the allegations in the Complaint as true.

Removing from the affidavit the misleading statements and adding in the omitted

information results in a corrected affidavit that would not have provided probable

cause or, at the very least, raises a question of fact for the jury on that issue.

The district court inverted the Rule 12(b)(6) standards by drawing inferences

***against*** the plaintiff and illogically presumed that even though the defendants were

working together to create the arrest affidavit, they weren't conspiring.

---

[3] *Id.*, p. 843 n. 4, citing Doc. 159 (App., Vol. 3, p. 735), citing the order that has
since been published: *People v. Linda Stanley*, 559 P.3d 697 (Colo. O.P.D.J. 2024).

The court did not accept as true Plaintiff's *Monell* allegations. Plaintiff alleged that Sheriff Spezze, a final policymaker for the County, was directly involved in the investigation and drafting of the Arrest Affidavit. Whether viewed as a "ratification" of the work of others or as a violation in which Spezze personally participated, this is sufficient for *Monell* liability.

## ARGUMENT

### A. Standard of review

The sufficiency of a complaint is a question of law reviewed *de novo*. *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021)("*Truman*"). This Court reviews the district court's probable cause determination *de novo*. *United States v. Little*, 119 F.4th 750, 770 (10th Cir. 2024).

To state a claim, "a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190-91 (10th Cir. 2012). "Plausible" does not mean likely to be true. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). "[S]pecific facts are not necessary," rather, the plaintiff "need only 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" *Khalik*, 671 F.3d at 1191

(quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

"[G]ranting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (citation omitted). The court must accept as true all well-pleaded factual allegations, drawing all reasonable inferences in the light most favorable to the plaintiff. *Ibid.*; *Iqbal*, 556 U.S. at 679. Even when a defendant asserts qualified immunity, this Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). The district court failed to apply these familiar standards in dismissing Plaintiff's claims.

**B. Plaintiff sufficiently alleged claims for malicious prosecution, fabrication of evidence, and violation of *Franks v. Delaware*.**

Knowingly or recklessly including false statements and fabricated evidence in a warrant affidavit and omitting exculpatory information, when the falsehoods, fabrications and/or omitted information was material to probable cause, violates the Fourth Amendment. *See Sanchez v. Hartley*, 810 F.3d 750, 755-58 (10th Cir. 2016); *Pierce v. Gilchrist*, 359 F.3d 1279, 1296, 1298 (10th Cir. 2004); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996); *United States v. Leon,* 468 U.S. 897, 923 (1984); *Franks*, *supra*.

11

The district court did not find Plaintiff failed to sufficiently allege misconduct. For the court, the question was probable cause. The court believed that even without the alleged misconduct, there still would have been probable cause to arrest and charge Plaintiff. *Order,* Vol. 4, pp. 843-852.

The question is not whether, in the abstract, there was probable cause but whether, on *de novo* review, this Court concludes a "corrected" affidavit (excluding false and misleading material including material information that was omitted) would have established probable cause. *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996). The inquiry is not whether the police had probable cause but whether "*the affidavit* would still have given rise to probable cause for the warrant." *Ibid.* (emphasis added), quoting *Wolford v. Lasater*, 78 F.3d at 489 and *Stewart v. Donges,* 915 F.2d 572, 582 n. 13 (10th Cir.1990); *Franks,* 438 U.S. at 155–56.

The court's broad sweep of all claims into the probable-cause basket was unsupported. For the fabrication-of-evidence claim, lack of probable cause is not required. The question is whether fabricated evidence was used to deprive the plaintiff of liberty. *Truman*, at 1236 and n. 5. Probable cause is not fatal to a fabricated evidence claim. *See, Smalls v. Collins*, 10 F.4th 117, 133 (2d Cir. 2021).

The district court's reliance on *Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011) is flawed. There, the probable-cause issues were decided on summary

judgment, after full discovery and factual development; even then, the four judges that looked at the issue were split 2-2. The district judge and one of the 3-judge appellate panel believed that the "corrected" affidavit would not have established probable cause. *Kerns v. Bader* does not support the district court's ruling here.

### 1.    Plaintiff sufficiently alleged a Warrant Clause violation.

Any reasonable person would have known that the information omitted from the warrant application—most tellingly, the DNA findings and the fact that the pushpin map was just a made-up theory, not based on reliable technical data – was the type of information the judge would have wished to know.  For information known by CBI and CCSD defendants but not revealed to those authoring the arrest affidavit (including Stanley and Lindsey), those who concealed information are not exonerated from liability because their conduct "caused" the violation. The district court did not reach this step, concluding instead there was plenty in the arrest affidavit to establish probable cause.

The district court erroneously decided witness credibility. *See, e.g.*, *Kartiganer v. Newman*, 450 F. App'x 713, 715 (10th Cir. 2011); *Fourth Corner Credit Union v. FRB*, 861 F.3d 1052, 1066 (10th Cir. 2017) (actual intent or state of mind is a factual inquiry that must be interpreted favorably to the non-movant).

The court placed too heavy a burden on Plaintiff at the pleading stage. Plaintiff did not need to plead all the evidence that ***proved*** his allegations. *Khalik*,

671 F.3d at 1192 (the complaint need not include all facts necessary to carry the plaintiff's burden); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)("The district court's inquiry into whether an alternative explanation was more probable undermined the well-established plausibility standard.").

The court's failure to give Plaintiff the benefit of all plausible inferences and instead to essentially make its own unilateral probable cause finding is analogous to a police officer unilaterally deciding what information to include in a warrant affidavit. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 13–14 (1948); *Payton v. New York,* 445 U.S. 573, 586 n. 24 (1980). It follows that those who author an affidavit cannot make unilateral decisions about the materiality of information, or, after concluding that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.

*Rainsberger v. Benner*, 913 F.3d 640, 652 (7th Cir. 2019) provides an excellent example of why the type of misconduct in this case violates the constitution. In an opinion authored by then-Judge Amy Coney Barrett, the court

14

found no probable cause. The detective relied on false information and excluded exculpatory evidence in the arrest affidavit and included innuendos and half-truths about, among other things, phone records. *Id.* at 645-646. Importantly, the detective knew of the deficiencies in the phone records yet chose to use the "inaccurate and incriminating" information in his affidavit. *Id.* The detective mischaracterized the plaintiff's behavior in a surveillance video to make it appear that the plaintiff threw away a murder weapon, but an objective view of the video showed him throwing away a piece of small trash. *Id.* The detective alleged the plaintiff was unconcerned for his mother (because he allegedly never asked the detective how she was doing the day she died), but the detective knew the plaintiff was getting text updates from his sister. *Id.* at 647. The officer's "probable cause" was simply the officer's belief that the murderer may have been someone familiar to the family. "Where [as here] an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes more than speculation or mere possibility to give rise to probable cause to arrest." *Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir.2009).

### 2.    Probable cause is a jury issue in this case.

Probable cause is usually a question for the jury that the court should reach only when there is no genuine issue of material fact. *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1215 (10th Cir. 2008). *See DeLoach v. Bevers,* 922

F.2d 618, 623 (10th Cir.1990)("*DeLoach*")("[I]t is a jury question in a civil rights suit whether an officer had probable cause to arrest."). More specifically, "[t]he *weight* that a neutral magistrate would likely have given the [information that was concealed or misrepresented] is not a legal question but rather is a question to be resolved by the finder of fact." *Golino v. City of New Haven*, 950 F.2d 864, 872 (2d Cir.1991) (emphasis added). See also *Sanservino v. Chrostowski*, 536 F. App'x 62, 64 (2d Cir. 2013) ("[T]he materiality of a misrepresentation or omission in an application for [an arrest] warrant is a mixed question of law and fact."). "Whether the allegedly false information is relevant to the probable cause determination is a question of law, while the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *Id.* at 64, 66 (because "it [was] a very close question whether the corrected affidavit…establishe[d] probable cause," the court could not "conclude, as a matter of law, that the alleged falsehoods in the [warrant] affidavit were immaterial to establishing probable cause").

The court relied upon cases decided only after discovery was complete. [App., Vol. 4, p. 847).  Three concerned rulings made during or after trial: *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985); *Deloach, supra*;[4] *Easton v. City of*

---

[4] In *DeLoach*, this Court found from trial testimony "[t]he alleged misstatements and omissions in this case clearly were material enough" to "submit[ ] the question of probable cause to the jury." *DeLoach,* at 623.

*Boulder*, 776 F.2d 1441, 1446 (10th Cir. 1985). *Bruner v. Baker,* 506 F.3d 1021, 1028 (10ᵗʰ Cir. 2007) concerned a summary judgment ruling. None involved a Rule 12(b)(6) motion to dismiss.

### 3. The corrected affidavit does not establish probable cause.

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Jones v. City & County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988). "[T]he relevant question is whether a substantial probability exist[s] that the suspect committed the crime," which "requir[es] something more than a bare suspicion." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("*Stonecipher*"). "Mere suspicion, common rumor, or even strong reason to suspect are not enough" to establish probable cause. *McKenzie v. Lamb*, 738 F.2d 1008, 1008 (9th Cir. 1984). The officers' subjective reasons for the arrest are irrelevant. *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004).

Viewing as true the facts alleged, the defendants authoring the arrest warrant acted knowingly or at least recklessly.  By definition, it cannot be arguably true that they acted constitutionally. By failing to credit allegations that contradicted some of its key factual conclusions, the court improperly "'weigh[ed] the evidence" and resolved disputed issues in favor of the moving party.'" *Tolan v.*

*Cotton,* 572 U.S. 650, 657 (2014)(emphasizing "the importance of drawing

inferences in favor of the nonmovant" in "qualified-immunity cases"), quoting

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

Plaintiff's allegations were sufficient to allow access to discovery. The court

failed to "resist [the] tendency" to "treat Rule 12(b)(6) as a grant of authority to

terminate [the] case" based on its own belief that the case "lack[ed] [a] promising

future[]." *Jacobs v. City of Chi.*, 215 F.3d 758, 775-76 (7th Cir. 2000)

(Easterbrook, J., concurring in part).

The district court's probable cause finding was flawed, as shown below:

| Judge's findings | Complaint's allegations |
|---|---|
| Plaintiff was controlling and both physically and emotionally abusive according to his wife … they fought frequently. She didn't feel safe at home with him and tried to break up with him a few days before she disappeared. *Order,* App. Vol. 3, p. 849. | This is neither probable cause nor based on reliable information.<br><br>The court's statement Suzanne "tried" to break up (i.e., that she attempted to "break up" but was unsuccessful) is completely unsupported. Plaintiff alleged these Affidavit statements were false and misleading and that exculpatory information was omitted. E.g. *Complaint*, App. Vol. 1, pp. 114-115 ¶¶ 540-548. |
| Morphew was suspicious that she was cheating, at least emotionally. *Ibid.* | Agents – not Morphew – suggested he must have been suspicious because he's not "a fool." Morphew responded he had "some intuition" but not that it was a "physical thing." *Affidavit*, App. Vol. 2, p. 287. It was *the investigators* who first told him Suzanne was having |

18

| Judge's findings | Complaint's allegations |
|---|---|
|  | an affair. He had not known it before. (*Ibid*). *See id*., pp.275-276; *id*., p. 6275 (when he was told: "she was the last person in the world I would suspect would do this.") See *Complaint*, App. Vol. 1, pp. 123-127 ¶¶ 603-642. |
| Morphew left in the morning, alone, to go to the Broomfield job instead of going that evening with a co-worker. *Ibid.* | Absent speculation, this does not even rise to a suspicion of criminal activity. Morphew called the co-worker at 11:18 a.m. from Broomfield and advised they would need an additional worker for the job. This was consistent with the statement that Morphew spoke with another worker at 1:45 p.m. and advised more help was needed for the Broomfield project. *Affidavit*, App. Vol. 2, pp. 47-48. <br><br> Defendants omitted critical exculpatory and corroborating facts about the Broomfield job that disputed their claim that it was a "created" alibi. *Complaint*, App. Vol. 1, pp. 100-102 ¶¶441-455. |
| A neighbor questioned why Morphew didn't plan to spend Mother's Day with Suzanne. Suzanne's father thought it was "strange" that Morphew "worked" on a Sunday. *Ibid.* | Their daughters were on a planned camping trip. *Affidavit*, App. Vol. 2, p. p. 7)  Other than speculation and guessing, there is no significance whatsoever to the fact that Morphew had a work job to get to on Sunday May 10th. The Affidavit omitted exculpatory facts about Plaintiff's attempts to reach Suzanne on Mother's Day. Complaint, *Complaint*, App. Vol. 1, pp. 102-106 ¶¶ 456-464, 479-486. |
| Morphew threw trash into a trash can in a McDonald's parking lot in Broomfield around 10:00 a.m. *Ibid.* | The video showed whatever he threw away was small and fit in his hand. *Order*, App. Vol. 3, p. 849. There was |

| Judge's findings | Complaint's allegations |
|---|---|
|  | nothing suspicious about how or what he discarded. *Cf. Rainsberger v. Benner*, 913 F.3d at 646 (finding plaintiff's throwing away trash in a public trashcan didn't contribute to probable cause). "Viewed in [the Plaintiff's] favor, the video depicts him carrying a small nondescript piece of trash through a parking lot and throwing it away near the entrance to the grocery store—in broad daylight and while other patrons are walking by." *Ibid.* |
| When questioned, Morphew didn't remember what he threw away. *Ibid.* | Morphew was first questioned about what trash he threw away at McDonald's on March 5, 2021 – almost ten months after the fact. *Affidavit*, App. Vol. 2, pp. 287, 289. That he might not remember exactly what he threw away doesn't rise even to the level of suspicious. A lack of detail in a memory is not the same as a lie about a material fact. *Cf. Fox v. Hayes,* 600 F.3d 819 (7th Cir. 2010)(finding no probable cause based on the plaintiff's omission of facts in his police interview because "what we have here is the omission of a detail, not a lie about a material fact.") |
| He tried to call and text his wife several times throughout this day. *Ibid.* | This is not suspicious behavior. |
| Morphew was the last person to see Suzanne alive. *Ibid.* | There is nothing suspicious about a husband being the last person to see his wife alive. |

| Judge's findings | Complaint's allegations |
|---|---|
| Morphew would have had time to kill and bury her. *Id.,* p. 850. | Having "time" to kill her is meaningless speculation in light of the complete absence of any evidence of a homicide or burial in or around the home. The prosecution's theory was that Morphew killed Suzanne in the afternoon (*Complaint*, App. Vol. 1, pp. 41, 50, 67 ¶¶88, 147, 241), yet her computer and phone were active late into the night. *Id*., pp. 76-78 ¶¶290-300.<br><br>There was no evidence of how, where, or when Mr. Morphew could have "buried" her. The car telematics showed no vehicle drove off-site overnight, the timeline in the morning and miles travelled on the car contradicted that theory, and cadaver dogs did not find evidence of a body. *Order,* App. Vol. 3, p. 849; Statements and innuendos in the Affidavit were false. *Complaint*, App. Vol. 1, pp. 65, 87-89, 110-112, 118-119, 131-137 ¶¶285, 357-373, 512-525, 576, 666-708.<br><br>Obviously, anyone who abducted Suzanne would have had time to bury her. This speculation isn't probable cause. |
| He had scratches on his arm after she disappeared. *Id.,* p. 849. | The affidavit indicates the scratches appeared to be healing and were "several" days old on May 13th, (*Affidavit*, App. Vol. 2, p. 229 n.30). i.e., not relevant to Suzanne's disappearance. |

| Judge's findings | Complaint's allegations |
|---|---|
| His memory about May 9th was "fuzzy" and he gave "conflicting statements including about whether they went on a hike together[.]" *Ibid.* | This is another lack of detail in a memory, not "a lie about a material fact." *Cf. Fox v. Hayes, supra,* (finding probable cause was lacking because "what we have here [in the plaintiff's police interview] is the omission of a detail, not a lie about a material fact.")<br><br>The district court ignored Plaintiff's allegations that his interrogators "coerced false and misleading statements" from him. *Complaint*, App. Vol. 1, p. 180 ¶ 947.<br><br>The Complaint alleges facts about the Affidavit's false claims that various of his statements were "conflicting" about the details of their weekend. E.g., *id.*, pp. 137-138 ¶¶ 709-718. |
| He suggested that saying "I don't recall" is code for not wanting to tell the truth, but himself stated that he didn't recall a number of key events leading to his wife's disappearance. *Ibid.* | The judge is mistaken. The affidavit states that, on February 28, 2021, Morphew "gave his code for knowing when people tell lies." (*Affidavit*, App. Vol. 2, p. 274). It doesn't state Morphew used the word "code" or that he told officers it meant he was lying to them. Morphew said James Comey was probably lying in his testimony to Congress because "they asked him questions and he said, 'I don't recall.' Just like Hillary Clinton. All, all them freakin' liberals don't 'recall anything' when they don't want to tell the truth." (*id.,* p. 275). The word "code" is the authors', not Morphew's. The judge's order reflects a credibility determination inappropriate for this stage. |

| Judge's findings | Complaint's allegations |
|---|---|
| An expert was surprised that a civilian would have those tranquilizer chemicals. *Id.,* p. 850. | Those chemicals are so commonly used by ranchers and hunters that they are routinely bought and sold in ranch stores throughout Salida and the surrounding areas. See *Complaint*, App. Vol. 1, p. 90 ¶ 380 and n. 11. |
| Morphew had owned tranquilizer chemicals and, even though he didn't own an operable tranquilizer gun, he did own one in the past. *Id.,* p. 850. | Facts alleged counter this speculation. *Id.*, pp. 86, 90-99, 119, 154-155 ¶¶356, 374-433, 578-580, 828-833. The Affidavit's allegations are false and misleading and material exculpatory information was omitted. Investigators knew Morphew didn't own an operable tranquilizer gun. The one he gave them hadn't been used and couldn't have been used. For months after they knew it was untrue, Prosecutors continued to lie about Morphew's tranquilizer gun, claiming in court pleadings it was the "murder weapon," until court proceedings in the spring of 2022 when prosecutors disavowed that theory and admitted the gun couldn't fire darts or anything else. *Id.*, pp. 155-156 ¶¶ 828-833. |
| He started liquidating assets. *Ibid.* | This was misleading. Barry and Suzanne had already been under contract to sell their Indiana property at the time she disappeared. The fact he had to sell assets to pay legal fees and because of the damage to his reputation in that small community is alleged as part of the damages. *Id.*, p. 165-166 ¶¶ 892, 895. |

| Judge's findings | Complaint's allegations |
|---|---|
| He started "seeing another woman." *Ibid.* | Morphew didn't meet the alleged "other woman" until months after Suzanne disappeared. *Id.*, pp. 127-129 ¶¶643-658. |
| His wife's mountain bike was found in a ravine near their home, and dogs detected her scent in that area. Unknown male DNA was found on the bike, on the carpet by their bed and on a stair in their house, and in her car. The DNA from her car potentially matched that from unsolved sexual assault investigations. *Ibid.*  Cadaver dogs did not alert to Plaintiff's truck, and GPS data indicated that his Bobcat skid steer had not been moved since before his wife's disappearance. *Ibid.* | This is all highly exculpatory and negates the baseless suspicions that maybe Morphew could have buried her body because he was a landscaper. False, incomplete, and misleading statements about these matters are sufficiently alleged. *Id.*, pp. 41-44, 52-61, 131-137 ¶¶91, 99-108, 158-213, 666-708. |
| Plaintiff is a skilled hunter and a landscaper and may have had the tools and expertise to kill his wife, bury her body, and destroy the evidence. *Ibid.* | This is sheer speculation, not probable cause. There was no evidence of any landscaping equipment or tools having been used. See *id.*, pp. 130-132 ¶¶659-672. |
| Mr. Morphew refused a polygraph. *Id.*, at 837. | To give this fact significance, the court has to inject its own credibility determination, which it cannot do on a motion to dismiss. Cf. *United States v. St. Clair*, 855 F.2d 518, 523 (8th Cir. 1988) (statement about defendant's refusing a polygraph "was a direct reference to [his] credibility.").  Courts have rejected the notion that evidence of an accused's unwillingness |

24

| Judge's findings | Complaint's allegations |
|---|---|
| | to undergo a lie detector test has no probative force in showing guilty knowledge or general consciousness of guilt. *E.g., Garmon v. Lumpkin Cnty., Ga.*, 878 F.2d 1406, 1410 (11th Cir. 1989) (plaintiff's refusal to take a polygraph during the investigation "as a matter of law does not give rise to an objectively reasonable inference that her report []was untruthful."); *United States v. Brown,* 289 F.3d 989, 994 (7th Cir. 2002) ("a defendant's refusal to take a polygraph rarely is considered probative evidence of deceit at trial or sentencing."); *St. Clair, supra.; Rivers v Ex-Cell-O Corp.*, 100 Mich App 824, 300 N.W.2d 420 (1980) (in a state malicious prosecution lawsuit, the court affirmed the trial court's refusal to permit evidence that the plaintiff refused a polygraph examination). |

The judge's list is a compilation of speculation, innocent behavior, and credibility judgments. The totality of these circumstances supports nothing more than bare suspicion. Probable cause requires more than that. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("more than bare suspicion"); *Sherouse v. Ratchner, supra,* 573 F.3d at 1062 ("more than speculation or mere possibility").

25

### 4. The court violated the Rule of Party Presentation.

Under Rule 8's notice pleading standards, Plaintiff didn't need to detail or dispute every false statement in the affidavit. This is particularly true of material not litigated by the parties. "The burden of going forward with evidence establishing the existence of probable cause is on the defendant in a 1983 action." *Karr v. Smith*, 774 F.2d at 1031. Here the judge (not any party) picked through the Affidavit and came up with his own list of purported probable cause. Simultaneously, he dismissed the case. His findings are replete with credibility determinations best left for the jury and certainly warranted an opportunity for Plaintiff to respond. The court thus violated the principle that courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008). See *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

### 5. Defendants are not entitled to qualified immunity.

Rule 12(b)(6) is a mismatch for qualified immunity. Asserting a qualified immunity defense via a Rule 12(b)(6) motion "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). See *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). For this reason, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on qualified immunity." *Wesley v. Campbell*,

779 F.3d 421, 433 (6th Cir. 2015). "Although an officer's entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point,…that point is usually summary judgment and not dismissal under Rule 12." *Id.* at 433-34; *see also Jacobs*, 215 F.3d at 775-76 (Easterbrook, J., concurring in part) ("[S]ummary judgment is the right way to handle claims of immunity… [Courts must] resist [the] tendency" to "treat Rule 12(b)(6) as a grant of authority to terminate cases that lack promising futures").

To survive a qualified immunity, the plaintiff need not demonstrate the alleged facts are probable or alternative explanations less likely; he must merely advance his claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "If [the plaintiff's] explanation is plausible, [his] complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible explanation." *Id.* Thus, if the alternative explanations are both plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017).

Qualified immunity does not protect the dishonest state actor. *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *Kerns v. Bader*, 663 F.3d at 1205. By definition, one who acts dishonestly does not demonstrate good faith.

### a. The rights were clearly established.

"No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest." *Pierce*, 359 F.3d at 1298; *Franks*, *supra. See also McAlister v. Kellogg*, 637 F. App'x 518, 519 (10th Cir. 2016) (omission of a "clearly critical" fact in the affidavit adequately stated a claim). "Qualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms." *Pierce*, 359 F.3d at 1299. Knowing or reckless misstatements or omissions do "not stem from a miscalculation of [an officer']s constitutional duties, nor [is] it undertaken in furtherance of legitimate public purposes that went awry." *Id.* at 1299-1300.  Such conduct can never be characterized as an objectively reasonable mistake. See *Sanchez v. Hartley*, 810 F.3d at 760 (defendants should have realized the knowing or reckless use of a false confession to institute legal process would violate a clearly established constitutional right). Any "purported uncertainty [does] not involve the constitutionality of the conduct," *ibid*, but rather, the ultimate impact of that misconduct.

### b.    "Arguable probable cause" cannot excuse a constitutional violation when a reasonable actor would know the misconduct was unlawful.

The court observed confusion in this Court's cases about whether probable cause is a jury issue when "arguable probable cause" is raised in a motion to dismiss based on qualified immunity: "[S]ome of the law, to me, is frankly somewhat confusing and borderline contradictory on this question of whether [probable cause is] always a jury question[.]" *Order*, App., Vol. 4, p. 783:9-11.

The district court was correct. This Circuit's Warrant Clause cases lend support for both the "arguable probable cause" standard and the "actual probable cause" standard. *Compare Wilkins v. DeReyes*, 528 F.3d 790, 801–02 (10th Cir. 2008) (applying actual probable cause), *with Stonecipher*, 759 F.3d at 1146–47 (applying arguable probable cause). *See Bailey v. Twomey*, 791 Fed. Appx. 724, 734 (10th Cir. 2019) (acknowledging a conflict and observing support for "actual" probable cause standard). Most of the cases are decided on summary judgment after facts are developed.  App., Vol. 4, pp. 787:4-9.[5]

Plaintiff argued that once a violation is established, "probable cause is an issue for a jury." App., Vol. 4, pp. 782:6-7, 784:3-4. All Plaintiff needs to do is

---

[5] On a motion to dismiss, a qualified immunity defense based on arguable probable cause "faces a formidable hurdle...and is usually not successful.'' *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)(internal quotation marks and citation omitted).

show it is plausible there is not probable cause. *Id.*, pp. 784:6-7, 12-13, 785:1-2. Here, a reasonable jurist (the state court judge) "was very doubtful" that probable cause would be found. *Id.*, p. 788:13-16, 20-22. The court "doesn't sit as the 13th juror, even at the qualified-immunity stage." *Id.*, p. 788:23-24. The qualified immunity question is a simple one: did the conduct violate clearly established law? See *id.*, p. 787:10-25. Plaintiff argued that here, "[i]t's very clearly established that what they were doing was unconstitutional" and suggested what the court was really asking was the "impact of it." *Id.*, p. 786:10-13.

This Court should clarify that (at least in a malicious prosecution/fabrication of evidence *Franks* violation/Warrant Clause conspiracy), the qualified immunity inquiry is complete once the court concludes that a reasonable officer would have known their conduct was unlawful.

The district court ruled that an officer's mistaken belief about probable cause bars the constitutional claims even if the unconstitutionality of their conduct was beyond debate and apparently, even if a lack of probable cause was plausible. *Order*, App. Vol. 4, p. 859. This flawed view turns qualified immunity on its head.

The district court's approach "would have the doctrine of arguable probable cause swallow the entire rule of qualified immunity…. This cannot be." *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 825–26 (2d Cir. 2014). Qualified immunity shields those who *reasonably believe their conduct is lawful*, not those who *know*

30

*their conduct is unlawful* but who might think they may get away with it. One who knowingly or recklessly commits a *Franks* violation, maliciously prosecutes, fabricates evidence, and/or conspires to do so does not act reasonably regardless of whether there is other probable cause.

"Arguable probable cause" more clearly applies in a false arrest case where an officer makes a mistake about probable cause and seizes someone in the heat of the moment. A false arrest suit is premised on the Fourth Amendment's "unreasonable searches and seizures" clause. That same logic wouldn't apply to a violation of the Fourth Amendment's Warrant Clause. "The Warrant Clause is not merely a probable-cause guarantee. It is a guarantee that a warrant will not issue unless a neutral and disinterested magistrate independently decides that probable cause exists." *Rainsberger v. Benner,* 913 F.3d at 650 (Barrett, Amy Coney, J.), citing *Franks*, at 164 and *Johnson v. United States*, at 14. The Warrant Clause's "protection consists in requiring that [evidentiary] inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Ibid*. In a Warrant Clause case, the officer's protection comes not in the first prong of the qualified immunity analysis (was there a violation) but in the second prong when the court determines if the conduct was proscribed by clearly established law.

31

As then-Judge Amy Coney Barrett explained, a qualified immunity rule that imagines an officer (not a court) assessing a hypothetical corrected affidavit "doesn't make sense." *Rainsberger,* at 652. Under qualified immunity analysis, "the court puts a competent officer in the defendant's shoes, facing the same choice that the defendant[s] did." *Ibid.* But here,

> [these defendants] did not face a choice about whether the facts in the hypothetical affidavit established probable cause. [They] faced a choice about whether to make false or misleading statements in the affidavit. … Thus, the relevant question is what a well-trained officer would have thought about the lawfulness of *that* action. … Of course, a competent officer would not even entertain the question whether it was lawful for him to lie in a probable cause affidavit.

*Ibid.* Now-Justice Barrett deems it "flatly inconsistent" with the qualified-immunity notion of good faith "to imagine a competent officer considering the question whether a lie helpful to demonstrating probable cause is so helpful that he should not tell it. That is neither a reasonable question to ask nor a reasonable mistake to make." *Id.*, at 653.

While "arguable probable cause" may shield an officer who arrests without a warrant (because that officer may be acting on a good faith but mistaken belief), it cannot shield an actor who commits a *Franks* violation because that officer can never be acting reasonably by lying in an arrest affidavit. Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, "the shield of qualified immunity is lost." *Golino v. City*

32

*of New Haven*, 950 F.2d at 871, citing *Malley v. Briggs,* 475 U.S. at 344-45

(adopting the *Leon* standard to gauge objective reasonableness). An officer can

have "no reasonable grounds" for believing a warrant was properly issued "[i]f the

magistrate or judge in issuing a warrant was misled by information in an affidavit

that the affiant knew was false or would have known was false except for his

reckless disregard of the truth," *Leon,* 468 U.S. at 923.

As Justice Sotomayor explained when she sat on the Second Circuit,

"whether a right is clearly established is ***the same question*** as whether a reasonable

officer would have known that the conduct in question was unlawful." *Walczyk v.

Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring). Once a court

determines there was a violation and the right was clearly established in that

context, "the qualified immunity inquiry is complete." *Id.* at 167.

The problem with the district court's "arguable probable cause" analysis is

that it "give[s] defendants a second bite at the immunity apple" and "erect[s] an

additional hurdle to civil rights claims against public officials that has no basis in

Supreme Court precedent" by "permit[ing] courts to decide that official conduct

was 'reasonable' even after finding that it violated clearly established law in the

particularized sense." *Id.* at 166, 168-69.  If a reasonable officer would have known

it was unlawful to fabricate evidence, put false statements in an affidavit and omit

material exculpatory evidence, that officer is not immune just because he believes

there is probable cause anyway, so the deceit and misconduct won't matter. This Court should "harmonize [its] qualified immunity analysis with the Supreme Court's directives." *Id.,* at 165.

For a *Franks* claim based on omitted information to survive qualified immunity, a Plaintiff must allege that a reasonable officer would recognize the exculpatory, material nature of the omitted information, i.e., know (or recklessly disregard) that a judge deciding probable cause would want to know the information. That standard is easily met here by the exclusion of the exculpatory DNA results and the other material identified in the Complaint and listed above.

If this Court disagrees, this Court should find Plaintiff has sufficiently alleged that the corrected affidavit reflected a lack of "arguable probable cause." The reasons are provided in the above chart detailing the district court's probable cause findings. A reasonable actor would have known that the omitted information was material to probable cause.

This qualified immunity claim is not a suitable issue for resolution on a motion to dismiss. See note 5, *supra*. Whether reasonable investigators would disagree on probable cause depends on factual questions about what they knew, what they omitted and whether the omitted information would have been material to a judge (not simply to the officer) in assessing probable cause.

Plaintiff has plausibly alleged that reasonable officers would *not* disagree about whether a corrected affidavit would establish probable cause. They are not entitled to qualified immunity on Plaintiff's malicious prosecution claim. Because defendants "cause[d] the prosecution [of Plaintiff] without arguable probable cause"—without objectively reasonably believing probable cause exists—"malice may be inferred." *Stonecipher*, 759 F.3d at 1146.

### 6. Absolute Immunity does not apply.

Because absolute immunity often turns on specific facts about defendants' conduct, it is often unresolvable until the summary judgment stage. *Harris v. Tioga Cnty.*, 663 F.Supp.3d 212, 240 (N.D.N.Y. Mar. 23, 2023)(declining to grant prosecutorial or qualified immunity without further factual development). *Cf. Bledsoe v. Carreno,* 53 F.4th 589, 607 (10th Cir. 2022)(qualified immunity is "typically resolved at the summary judgment stage rather than on a motion to dismiss."). Defendants bear the burden of showing it applies. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Burns v. Reed*, 500 U.S. 478, 486 (1991).

Given the severe costs to the public of applying absolute immunity –because it risks individuals escaping accountability despite committing indisputably unconstitutional acts – the Court has been careful to limit its scope.

*Burns* and *Buckley* make clear that investigative activities by prosecutors such as fabricating evidence and/or advising law enforcement officers about the

35

use of hypnosis to obtain evidence of probable cause for a warrant were purely investigative activities. *Burns,* at 482-83; *Buckley*, at 275-76. Destroying exculpatory evidence and fabricating a false confession are beyond the reach of absolute immunity. *Odd v. Malone,* 538 F.3d 202, 210-11 (3d Cir. 2008).

The scope of absolute immunity depends on the function performed, not the "status of the defendant." *Briscoe v. LaHue*, 460 U.S. 325, 342 (1983). *Buckley,* at 269. Absolute immunity doesn't extend to investigative functions [*id.,* at 273; *Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009); *Imbler v. Pachtman,* 424 U.S. 409, at 431, n. 33 (1976)]; nor to giving legal advice to police. *Burns*, 500 U.S. at 482. It doesn't extend to "'fabricating evidence during the preliminary investigation of a crime.'" *Truman*, at 1240, n.8, quoting *Buckley*, at 261, 272–76; *Harris*, *supra*. *Cf. Marshall v. Dix,* 640 F.Supp. 3d 1033 (D.Colo. 2022)(denying absolute immunity for claim that the DA's investigator included false statements in an arrest warrant affidavit). The *Harris* court denied summary judgment on the grounds of both qualified and absolute immunity because "a reasonable jury could conclude that DA Keene, acting in a pre-indictment investigative capacity, participated in the fabrication of certain material evidence…." *Harris,* at 243; *id*., at 240-241, citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022)(collecting cases) and *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001)(rejecting immunity defense in fabrication-of-evidence case); *Morse*

*v. Fusto*, 804 F.3d 538, 547–48 (2d Cir. 2015); *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000)(no qualified immunity where the complaint alleged the prosecutor fabricated evidence while acting in an investigative capacity). Review of an affidavit "is not sufficient to confer absolute immunity." *Mink v. Suthers*, 482 F.3d 1244, 1262 (10th Cir. 2007).

 The question is whether each of the prosecutor defendants participated in authorship, advised police about it, used fabricated evidence, inserted falsehoods, omitted exculpatory evidence, etc.  *Cf. Chilcoat v. San Juan County*, 41 F.4th 1196 (10th Cir. 2022); *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008). *It was a sworn affidavit*, and they investigated and helped prepare it. Stanley and Lindsey allowed their names to be used, vouching for the factual statements in the Affidavit.  Absolute immunity doesn't apply. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 129-130 (1997).

 "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but [the Supreme Court has] never indicated that absolute immunity is that expansive." *Burns, supra*, at 495-96.  "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial."

*Buckley*, 509 U.S. at 276, quoted in *Harris*, at 243. See *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)(prosecutor who fabricated evidence wasn't entitled to absolute immunity even though it was later introduced at trial).

When a court orders the production of certain evidence (as occurred here), the court order "remove[s] all discretion from the prosecution." *Munchinski v. Solomon,* 747 F. App'x 52, 60 (3d Cir. 2018), removing absolute immunity protection. *Siehl v. City of Johnstown*, 365 F. Supp. 3d 587, 598 (W.D. Pa. 2019), quoted in *Marshall v. Dix*, *supra*, 640 F.Supp. 3d at 1054.

### C. Plaintiff sufficiently alleged causation and personal participation for all counts, including the conspiracy count.

### 1. The district court imposes too heavy a burden.

Rule 8(a)(1) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," not detailed factual allegations. *Iqbal*, at 678. Plaintiff isn't required to plead minutia regarding the exact course of the conspiracy, nor could Plaintiff do so prior to discovery, as such evidence is exclusively in the defense's hands. See *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980); *Birdsong v. Unified Government of Kansas City*, No. 13-2090, 2014 WL 2216904, at *5 (D. Kan. 5/29/2014)(unpublished). Plaintiff was not required to detail at the pleading stage—prior any discovery—every participant in each meeting nor what each one knew or told the others.

Rule 8 doesn't prevent collective allegations or groupings, so long as it is clear which defendant is being sued for which claim. *Briggs v. Johnson*, 274 Fed. Appx. 730, 736 (10th Cir. 2008). Collective defined defendant subgroupings is allowed. *Bledsoe v. Bd. of County Comm'rs, Cnty of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1078-80 (D.Colo. 2020); *Dawson v. Bd., Cnty. Comm'rs, Jefferson Cnty., Colorado*, 6-CV-01281-MEH, 2017 WL 5188341, at *11 (D.Colo.1/3/2017) (unpublished), *aff'd*, 732 F. App'x 624 (10th Cir. 2018); *APMC, Inc. v. Fogarty*, 08-249, 2008 WL 4279780, at *2 (W.D. Okla. 9/12/2008)(unpublished) (plaintiff identified specific activities, a discrete time frame, and no confusion exists which defendants are sued for which counts); *Birdsong*, *supra,* at *2 ("the collective 'defendants'…can reasonably be understood to mean [plaintiff alleges] all four Defendants engaged in the alleged activities"). This Court has found "no rule"

> stating that a party cannot sue multiple defendants for the same wrongful conduct. And Plaintiff did not merely allege general conduct by 'Defendants.' Instead, she pleaded each defendant's conduct in a separate paragraph, alleging that each defendant acted by *participating*, *entering* and *searching*, and *aiding* and *abetting*.

*Cuervo v. Sorenson*, 112 F.4th 1307, 1314 (10th Cir. 2024)(citing *Robbins*, 519 F.3d at 1250; *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023)). There, Plaintiff's identical allegations were not "suspect—especially in the absence of discovery allowing her to more specifically describe each defendant's purported conduct." *Cuervo*, footnote 5.

This is not "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, at 678. This is an extraordinarily detailed Complaint that satisfies pleading requirements.

### 2. Even though Walker swore to and executed the affidavit, that doesn't absolve other participants and co-conspirators.

Section 1983 applies not only to a person who "subjects," but also to any person who "causes" the deprivation of constitutional rights. Congress was "concerned not just with the officer who formally initiates the process," but all those who caused the deprivation of rights. *Pierce,* 359 F.3d at 1292. "[D]irect participation is not necessary[.]" *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-1280 (10th Cir. 2008). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Ibid.*

Plaintiff's allegations and reasonable inferences therefrom meet this standard. That Defendant Walker swore to the affidavit does not preclude liability for others, *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012), because people are "responsible for the natural consequences of [their] actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961).

The court erred in refusing to draw the plausible inference that the defendants who authored the arrest affidavit [*Complaint*, App. Vol. 1, p. 49 ¶140]

40

knowingly or recklessly fabricated the push pin map and inserted other false statements and omitted material exculpatory information, that the CBI defendants [*id*., pp. 32-35 ¶¶ 32-42] intended to ensure omission of exculpatory DNA information, and that all the defendants worked together in a conspiracy to have Morphew wrongfully prosecuted [*id*., pp. 147-148 ¶¶777-782]. *Montoya v. City & Cnty. of Denver*, 21-1107, 2022 WL 1837828, at *8 (10th Cir. 6/3/2022) (unpublished) (recognizing an officer is subject to liability on a *Franks* claim if he helped prepare the complaint *by providing information for use in it.*)

### 3. Plaintiff sufficiently alleged a conspiracy and each defendant's personal participation in it.

Throughout, Plaintiff alleged specific acts each defendant took in furtherance of the conspiracy, explained when the alleged conspiracy began, and specified how it was executed through both fabricating evidence and withholding exculpatory evidence. It is reasonable to infer those working on the investigation worked together to accomplish the alleged constitutional deprivations. *E.g. Complaint*, App. Vol. 1, p. 65 ¶236 (Defendant Cahill expressly warned some co-conspirators (including Graham, Rohrich, Lindsey, Walker but not listing Stanley) the phone/GPS data was unreliable). Defendants were in cahoots, working together as each omitted his exculpatory piece of the puzzle or fabricated false evidence. Discovery will better reveal which defendants concealed which evidence from which others. The general allegation that Spezze and Stanley supervised those who

undertook more specific unlawful actions supports an inference they participated in the conspiracy to frame Morphew.

Plaintiff adequately alleged a conspiracy to violate *Franks v. Delaware,* fabricate evidence and to cause his malicious prosecution and adequately alleged each Defendant personally participated in those conspiracies. A reasonable inference from the conspiracy alleged is that Defendants purposefully failed to collect other evidence that could have revealed the true perpetrator and instead focused all their efforts on framing Plaintiff. *Cf. Montoya, supra,* at *8 (Although "Montoya's allegations of conspiracy are not impressively detailed, and some of the boilerplate language he uses might not hold up in every case. But under the circumstances here, and in the context of this complaint viewed as a whole, nothing more is needed to allege conspiracy under §1983."). The Complaint includes detailed factual allegations that all defendants "act[ed] in concert" with "a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective" to fabricate evidence, lie in the Affidavit, and maliciously prosecute Plaintiff. *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021). It is certainly "plausible" Plaintiff will be able to prove his claims following discovery.

"[B]ecause direct evidence of an agreement to join a conspiracy is rare, a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *Bledsoe*, 53 F.4th at 609. By its "very nature," a conspiracy often enlists multiple

actors with distinct roles to accomplish a shared unlawful goal[.]" *Janny v. Gamez*, 8 F.4th 883, 922 (10th Cir. 2021). Morphew alleges Rohrich, Spezze, Stanley, Lindsey, Cahill, Duge, Rogers, Graham, Walker and the others (particularly those authoring the arrest affidavit) "falsified an affidavit in support of the warrant for his arrest" and "ignored [or intended] the obvious falsity of [the statements in the Affidavit] and that each advanced the clear common goal." *Montoya, supra*, at *8. Plaintiff's allegations are sufficient to "nudge" his conspiracy claim "across the line from conceivable to plausible." *Twombly*, at 570.

### 4. Plaintiff sufficiently alleged liability of non-prosecutor defendants.

The district court suggests that non-prosecutor defendants can be liable only if they conceal facts from the prosecutors (the "ringleaders"). *Order*, App. Vol. 4, pp. 853, 855. This interpretation would bar Section 1983 claims for malicious prosecution, *Franks* violation, and fabrication of evidence, because prosecutors are always involved in a criminal case.

Plaintiff did not allege the investigators told the investigating prosecutors (Stanley and Lindsey) about the exculpatory DNA information prior to filing of the Arrest Affidavit. See *Complaint,* Vol. 1, 44 ¶108 (alleging the exculpatory information did not appear in the Arrest Affidavit). See *id*., p. 55, ¶174 (Defendants Duge and Rogers "claimed they intentionally withheld the Phoenix and Illinois [DNA] matches [from] Defendants authoring the Arrest Affidavit.");

43

*id*., p. 65 ¶236 (Defendant Stanley not listed among co-conspirators that Cahill warned).  Whether non-prosecutors lied to or mislead the prosecutors (or whether some prosecutors mislead others) is a causation argument that must await discovery and factual development.

Plaintiff alleges more than that the non-prosecutor defendants failed to intervene. See Order, Vol. 4, p. 853. The district ignores that Defendant Walker swore to and executed the arrest affidavit. Defendant Cahill edited and worked on it. True, prosecutors Lindsey and Stanley worked on it, but that does not diminish the personal participation of Walker or Cahill. The question is not whether every defendant authored or attested to every sentence. It is whether they *caused* the constitutional violations. 42 U.S.C. §1983.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Montoya, supra*.

The court suggests Plaintiff alleged Defendant Hurlbert knew about the CODIS matches. *Order*, App. Vol. 4, p. 855, citing *Complaint,* App. Vol. 1, p. 129. But the court conflates two separate allegations.  Defendant Hurlbert was not on the case when the affidavit was filed but joined in the summer of 2021. *Complaint,* Vol. 1, p. 152-153, ¶¶812-815.  He is personally responsible for *continuing* a malicious prosecution, but there is no claim he *instigated* it.  That he learned about the CODIS matches doesn't diminish the allegations against prosecutors Lindsey

and Stanley for their conduct and the conspiracy during the winter of 2020 into the Summer of 2021.

### 5.    The allegations about Defendant Himschoot are sufficient.[6]

The district court finds the allegations against Defendant Himschoot too "oblique" to state a claim because Plaintiff didn't "direct allege" that he planted evidence. *Order*, App. Vol. 4, p. 854. The complaint sufficiently raises a reasonable inference and provides more than sufficient notice at this pre-discovery stage. *Complaint*, App. Vol. 1, pp. 32, 42, 57, 93-96 ¶¶29, 31, 92-93, 188, 389-390, 398-416. There were numerous falsehoods and omissions regarding the needle cover. *Ibid.* The Complaint sufficiently alleges Himschoot's personal participation in the conduct. Read "in tandem with [Morphew's] factual allegations elsewhere in the complaint," *Bledsoe*, 53 F.4th at 608, there is ample notice and no confusion about what Himschoot is alleged to have done.

### D.    Plaintiff sufficiently alleged Reckless Investigation.

The district court acknowledges that the concept of "reckless investigation" is embedded into a malicious prosecution claim but finds no support in the Tenth Circuit for a separate cause of action. *Order*, App. Vol. 4, p. 844 n. 6.  Plaintiff disagrees and asks this court to find ample support for a separate cause of action.

---

[6] The Complaint sometimes spells "Himschoot" (correct) as "Himshoot" (incorrect).

Reckless investigation is inherent in a *Franks* claim when defendants are alleged to have recklessly included falsehoods or recklessly omitted material exculpatory information. The constitutional standard was clearly established at least by 1978 when *Franks v. Delaware* was decided.

The district court is incorrect that only the Eighth Circuit recognizes a reckless investigation claim in cases where an arrest warrant issued. *Cf. United States v. Tanguay*, 787 F.3d 44 (1st Cir. 2015). There, because the district court "entertained some doubts based on [the affiant's] failure to follow investigatory leads," the criminal case was remanded for further factfinding about whether affiant's "failure to fully investigate witness's background constituted a reckless disregard for the truth [for purposes of the *Franks* motion]." There, "the district court erred in ruling as a matter of law that an affiant never has a duty to make further inquiry before presenting a warrant application to a magistrate." *Id.*, at 53. Here, the district court found "infuriating flaws" in the investigation, calling it "in a number of senses, *wrongful*" and calling the arrest "foolish and flawed." *Order*, Vol. 4, pp. 843, 851 n. 8 (emphasis in *Order*). Thus, liability for a reckless investigation may well be part and parcel of the *Franks* violation.

It is also embedded in the notion of probable cause. In a false arrest context, this Court has ruled that a police officer "may not close her or his eyes to facts" and must pursue "reasonable avenues of investigation" prior to an arrest. *Baptiste v.*

46

*J.C. Penney, Co., Inc.*, 147 F.3d 1252, 1257 (10th Cir. 1998), quoting *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). Accord, *Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007); *Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995). The reasonable inference is that Defendants Stanley, Spezze, and others were focused on making a media splash for the anniversary of Suzanne's disappearance. See *People v. Stanley*, *supra,* 559 P.3d at 709 (cited in *Order*, App. Vol. 4, p. 843 n. 4), rather than focused on ensuring that an arrest warrant was not sought on the basis of a reckless investigation.

Plaintiff was correct that the constitutional rule applies with obvious clarity, in this case.[7] Plaintiff has alleged Defendants knew they were fabricating evidence, lying and misleading the court in the arrest affidavit and knowingly or recklessly initiating and continuing a malicious prosecution. Viewed as true, there is no doubt that any reasonable actor would have known that the reckless investigation would violate Plaintiff's constitutional rights. See *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning," as when the decisional law applies "with obvious clarity to the specific conduct in question[.]" *Ibid*, quoting *United States v. Lanier,* 520 U.S. 259, 270-271 (1997); *Taylor v. Rioja*s, 592 U.S. 7, 7-9 (2020). The "salient

---

[7] See App. Vol. 3, pp. 523-524, 553-555, 576-577, 601-602,  608-612, 622, 624-626, 634-636, 646-649.

question" is whether the state of the law gave fair warning that their failure was unconstitutional. This Court should find a sufficient foundation for a separate reckless investigation claim in Warrant Clause cases.

### E.    Plaintiff sufficiently alleged Failure to Intervene

The district court found that any defendant alleged to have failed to intervene had qualified immunity from that theory of liability, because not until 2022 did this Court recognize a separate claim for "failure to intervene" outside the excessive force context. *Order,* App. Vol. 4, p. 856 (citing *Bledsoe*, 53 F.4th at 616 and *Shaw v. Schulte*, 36 F.4th 1006, 1020 (10th Cir. 2022)).

Plaintiff was correct that the constitutional rule applies with obvious clarity, particularly in a conspiracy case.[8] The same analysis above applies here. The duty to intervene in the situation alleged here would have been obvious to any objectively reasonable law enforcement officer. Any reasonable investigator in the defendants' situation would have known they had a duty to intervene to prevent use of false information in an arrest affidavit and to ensure that highly exculpatory information known to the investigation team was provided to prosecutors and courts. See *Hope v. Pelzer*, *supra. United States v. Lanier, supra*; *Taylor v. Rioja*s, *supra.*

---

[8] See footnote 7, *supra*.

The difference between being a conspiratorial participant in a particular act and being an observer who failed to intervene is a line-drawing exercise that must await full discovery in virtually any case. But for actors where discovery will show they were able to intervene, any reasonable actor would know their conduct was unlawful if they failed to do so.

### F.    Plaintiff sufficiently alleged municipal liability

Plaintiff adequately stated a plausible claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Contrary to the district court's conclusion, Plaintiff's allegations and the reasonable inferences therefrom plausibly allege a *Monell* claim.  "[Plaintiff]'s complaint is not just a 'boilerplate recitation' of a § 1983 cause of action." *Walker v. Zepeda*, No. 111CV01242DMECBS, 2012 WL 13285403, at *5 (D.Colo. 5/29/2012) (unpublished).

No "heightened pleading standard" applies to *Monell* claims. *Leatherman v. Tarrant County*, 507 U.S. 163, 168 (1993). The *Twombly* Court expressly denied that it was requiring any "heightened fact pleading of specifics." 550 U.S. at 570. "The reasons for not requiring heightened fact pleading in a § 1983 municipal liability complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage."

*Walker v. Zepeda*, *supra*, at *5.  At the pleading stage to show a deficiency in training, "specific facts are not necessary" to state a claim for relief, *Khalik*, 671 F.3d at 1191. Even without knowing all the details of CCSD's training programs prior to discovery, it is sufficient to allege that final policymakers were intricately involved in the constitutional violations because a reasonable inference can then be drawn about their training and supervision within the Department. Final policymakers committed the misconduct; it is a reasonable inference from the allegations that as goes their conduct, so goes their training and policies.

A complaint is "sufficient where it contain[s] not only a boilerplate recitation of the grounds for municipal liability, [but also] *some additional allegation to put the municipality on fair notice of the grounds for which it [is] being sued*." *Walker*, at *5 (internal quotation marks and citations omitted). The Complaint gives CCSD and the County fair notice of Plaintiff's *Monell* claims: it is not just "a boilerplate recitation of the grounds for municipal liability."

Municipalities are "'answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules.'" *Whitson v. Bd. of County Comm'rs of County of Sedgwick*, 106 F.4th 1063, 1067 (10th Cir. 2024)(internal citations omitted). Proof that an "authorized decisionmaker" has taken the action or directed it establishes *Monell* liability.  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

Plaintiff alleged that specific actions taken by Defendants Spezze and Rohrich as final policymakers caused the constitutional violations. *Complaint,* Vol. 1, p. 30 ¶¶ 20-24. Spezze and Rohrich are identified as authors of the Affidavit. *Id*., pp. 46-47, 49 ¶¶124, 140. Rohrich was one of the conspirators who specifically knew by December 4, 2020, that there was a CODIS match from an unsolved sex offense in Tempe, Arizona to the partial genetic DNA profile collected from Suzanne's car. *Id*., pp. 44, 55, 158 ¶¶ 106, 171-172, 848. Rohrich knew the location data that was being put in the Affidavit was unreliable. *Id*., pp. 65-66 ¶¶ 236-237. Rohrich knew that the "airplane mode" statements being put in the affidavit were false. *Id*., p. 71 ¶¶ 261-264]. Rohrich knew that the statements put in the affidavit about the lack of activity on Suzanne's computer late into the night of May 9th were untrue statements. *Id*., pp. 76-78 ¶¶ 291-300. Rohrich and Spezze both knew that the Affidavit was handling the subject of the mountain lion in a misleading manner and knew exculpatory information about mountain lions in the area was purposely omitted. *Id*., pp. 139-140 ¶¶ 719-730]. Spezze directly supervised and worked closely with Rohrich as his undersheriff. These are very specific allegations. It is inconceivable that Spezze and Rohrich were not working together to achieve the same unlawful goal.

The court's demands for factual specificity about training, supervision, policy, and custom are unreasonable. "It is not reasonable to expect a plaintiff to

have information about other incidents at the pleading stage; instead, a plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims." *Wilson v. City of Chicago*, No. 09 C 2477, 2009 WL 3242300, at *3 (N.D. Ill. 10/7/2009)(unpublished); *McCormick v. City of Chicago,* 230 F.3d 319, 325 (7th Cir. 2000); *Sledd v. Lindsay,* 102 F.3d 282, 288–289 (7th Cir.1996).

### G.     This court should not apply the doctrines of qualified or absolute immunity.

Section 1983 "on its face admits of no immunities." *Malley v. Briggs*, 475 U.S. at 339-40. Starting with *Pierson v. Ray*, 386 U.S. 547 (1967), however, the Court began reading a qualified immunity defense into the statute.

As enacted, §1983, explicitly instructed its protections were to be applied "notwithstanding" state laws, "custom, or usage" that might be invoked as a shield from liability. Pub. L. 42-22, ch. 22, § 1, 17 Stat. 13 (1871). But without Congress's authorization, the Reviser of Federal Statutes omitted that "Notwithstanding Clause" from the publication. Alexander Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 235 (2023). The Notwithstanding Clause means "Rights-violating state actors are liable —period— *notwithstanding* any state law to the contrary." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023)(Willett, J., concurring).

In *Procunier v. Navarette*, 434 U.S. 555, 562 (1978), the Court adopted a new, radically broader immunity doctrine—attaching immunity *unless* the right was already "clearly established." "Truth to tell," Justice Scalia later objected, *Procunier* "did not trouble itself with history," but instead "simply set forth a policy prescription." *Richardson v. McKnight*, 521 U.S. 399, 415-16 (1997)(Scalia, J., dissenting). Since *Procunier,* the Court has "completely reformulated qualified immunity along principles not at all embodied in the common law," instead emphasizing "precisely the sort of freewheeling policy choices" the Court has so insistently "disclaimed the power to make" in other contexts. *Ziglar v. Abbasi*, 582 U.S. 120, 158-60 (2017) (Thomas, J., concurring) (cleaned up).

This Court's policy-based qualified-immunity jurisprudence has spawned confusion just like that experienced by the court below. See *Order,* App., Vol. 4, p. 783:9-11 ("somewhat confusing and borderline contradictory" case precedent). The doctrine shouldn't excuse actors–including prosecutors–who are alleged to have fabricated evidence, lied and misled the court, and maliciously prosecuted.

It is time to restore Section 1983 immunity to its objective, common-law foundation. *Ziglar*, *supra.* See also Justice Thomas's opinions in *Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) and *Baxter* v. *Bracey*, 140 S.Ct. 1862 (2020). See also Joanna Schwartz, *The Case Against Qualified Immunity*, 93:5 NOTRE DAME L. REV. 1798, 1800 (2018); *Rehberg v. Paulk*, 566 U.S. 356, 366 (2012); *Kalina*, at

132, 135 (Scalia, concurring)("There was, of course, no such thing as absolute

prosecutorial immunity when § 1983 was enacted."); *Burns v. Reed*, *supra,* 500

U.S. at 497 (opinion of Scalia, J.)

Because judges should not "substitute [their] own policy preferences for the

mandates of Congress," *Hoggard,* at 2422 (quoting *Ziglar,* at 160 (opinion of

THOMAS, J.)), and for the reasons articulated in these opinions and scholarly

sources, Plaintiff respectfully requests that this Court decline to apply the doctrines

of qualified or prosecutorial immunity.

Judges from lower federal courts, as well as legal scholars, have joined these

calls to rethink and rework the qualified immunity analysis or to eliminate

qualified immunity altogether. *E.g. Green v. Thomas,* 734 F. Supp. 3d 532, 569

(S.D. Miss. 2024), *aff'd in part, rev'd in part,* No. 24-60314, __ F.4th ___, 2025

WL 670451 (5th Cir. Mar. 3, 2025) ("the doctrine should come to its overdue

end."); *Roemer v. Bd. Regents*, *NMSU*, No. CIV 22-0524 JB/JHR, 2025 WL

641228, at *54 n. 94 (D.N.M. 2/27/2025)(unpublished); J. Schwartz, *supra*;

William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018);

Karen Blum, *Qualified Immunity: Time to Change the Message*, 93:5 NOTRE DAME

L. REV. 1887, 1888-92 (2018) (collecting cases); *Zadeh v. Robinson*, 928 F.3d 457,

480-81 (5th Cir. 2019) (Willet, J., dissenting) (quoting *Marbury v. Madison*, 5 U.S.

137, 163 (1803)).  There is "a growing, cross-ideological chorus of jurists and

54

scholars urging recalibration of contemporary immunity jurisprudence." *Id.* at 480.

Though Plaintiff understands this Court's obligation to apply qualified immunity doctrine as established by the Supreme Court, Plaintiff encourages this court to apply it sparingly and, in its opinion, to candidly acknowledge the shortcomings of present case law.

If this Court disagrees with respect to qualified immunity, Mr. Morphew requests that this Court reject the objective standard and rule that to avail themselves of absolute or qualified immunity, defendants must show subjective evidence of good faith. See *Baxter*, at 1863 (opinion of Thomas, J.).

## H.    This court should direct the district court to reconsider its order declining to exercise jurisdiction over Plaintiff's state law claims.

If this Court reverses the court's dismissal of the § 1983 claim, it should also vacate the dismissal of Plaintiff's state law claims and direct the court to reconsider its order declining to exercise jurisdiction. See *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1177 (10th Cir. 2020); *Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005). The claims do not raise "a novel or complex issue of State law," do not "substantially predominate[ ] over the claim or claims over which the district court has original jurisdiction," and do not present "exceptional circumstances" leading to "other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(1), (2) & (4). Economy, convenience, fairness, and comity all support jurisdiction over the state law claims if the federal claims are reinstated.

Under these circumstances, if the federal claims are reinstated, the district court should be instructed to reconsider its decision declining jurisdiction over the state law claims.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court reverse the district court's dismissal of Plaintiff's claims, instruct the court to reconsider its declination of jurisdiction over Plaintiff's state law claims, and remand for further proceedings.

## REASONS FOR ORAL ARGUMENT

Plaintiff believes that oral argument would assist the Court in resolving the issues on appeal. The Court below observed confusion in this Court's decisions regarding application of the concept of "arguable probable cause" to a case alleging a *Franks* violation, fabrication of evidence, malicious prosecution, and conspiracy.

Dated:  March 14, 2025

> FISHER & BYRIALSEN, P.L.L.C.
>
> */s/ Jane Fisher-Byrialsen*
> Jane Fisher-Byrialsen, Esq.
> 4600 S. Syracuse Street, 9th Floor
> Denver, Colorado 80237
> Telephone: 303-256-6345
> E-Mail: Jane@FBLaw.org

SAMLER AND WHITSON, PC

*/s/ Hollis Whitson*
Hollis Whitson
Eric Samler
Samler and Whitson, PC
1600 Stout Street, Suite 1400
Denver, CO 80202
Telephone: (303) 670-0575
E-Mail: Hollis@SamlerandWhitson.com

*Attorneys for Plaintiff-Appellant Barry Morphew*

## <u>CERTIFICATE OF COMPLIANCE WITH WORD VOLUME LIMITATION</u>

This brief complies with the type-volume limitation of Fed. Rules App. P. 5 and 32(a)(7)(B) because it contains **12,957** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(i) and Local Rule 32.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface.

Dated: March 14, 2025.

*/s/ Jane Fisher-Byrialsen*
Counsel for Plaintiff-Appellant

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender, version Windows 11, updated March 12, 2025 and according to the program are free of viruses.

Dated: March 14, 2025

*/s/Abigail Clement*
Paralegal

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 14th day of March 2025, I electronically filed the foregoing **PLAINTIFF-APPELLANT'S OPENING BRIEF** via CM/ECF. All participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF System.

Dated: March 14, 2025

*/s/Abigail Clement*
Paralegal

# ATTACHMENT  A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:23-cv-01108-DDD-JPO

BARRY MORPHEW,

      Plaintiff,

v.

CHAFFEE COUNTY, Colorado;
BOARD OF COUNTY COMMISSIONERS OF CHAFFEE COUNTY,
Colorado;
CHAFFEE COUNTY SHERIFF'S DEPARTMENT;
LINDA STANLEY, District Attorney, in her official and individual ca-
pacities;
JOHN SPEZZE, Chaffee County Sheriff, in his official and individual
capacities;
ALEX WALKER, Eleventh Judicial District Attorney's Office Investi-
gator;
JEFFREY LINDSEY, Deputy District Attorney;
MARK HURLBERT, Deputy District Attorney;
ANDREW ROHRICH, Chaffee County Undersheriff;
JOHN CAMPER, Colorado Bureau of Investigation Director;
SCOTT HIMSCHOOT, Chaffee County Sheriff's Deputy;
JOSEPH CAHILL, Colorado Bureau of Investigation Agent;
MEGAN DUGE, Colorado Bureau of Investigation Agent;
CAITLIN ROGERS, Colorado Bureau of Investigation Agent;
DEREK GRAHAM, Colorado Bureau of Investigation Agent;
KEVIN KOBACK, Colorado Bureau of Investigation Agent;
KIRBY LEWIS, Colorado Bureau of Investigation Agent;
CHRIS SCHAEFER, Colorado Bureau of Investigation Deputy Director
of Investigations; and
JOHN/JANE DOES 1-10, and other unknown employees of the Elev-
enth Judicial District Attorney, and other unknown officers of the
Chaffee County Sheriff's Department,

      Defendants.

---

## ORDER GRANTING MOTIONS TO DISMISS

---

On Mother's Day, 2020, Plaintiff's wife, Suzanne Morphew, disappeared. After a year of investigation, Plaintiff was charged with murdering her. Shortly before trial began, Plaintiff's legal team discovered that the government had not disclosed a variety of potentially exculpatory information to him and the court. Doc. 1 at 127-32. Prosecutors filed a motion to dismiss all charges against Plaintiff without prejudice, and the case was dismissed on April 19, 2022, just before it was set for trial. *Id*. at 134.

Plaintiff now sues the prosecutors, investigators, officers, and municipalities involved in his arrest and abandoned prosecution, alleging that they conspired to violate his rights and maliciously prosecute him. Specifically, Plaintiff alleges that the affidavit prosecutors submitted to justify his arrest was full of misrepresentations and omissions that led to his arrest and jailing without probable cause to believe he committed the crime. Doc. 1. The defendants have filed seven different motions to dismiss the claims against them. Docs. 87, 94, 95, 97, 98, 104, 108.[1] The motions are granted.

## BACKGROUND

Plaintiff is presumed innocent of his wife's murder, and at this stage of the case, the allegations in his complaint in this civil lawsuit are presumed true. Those allegations paint the following picture.

## I.     Mrs. Morphew's Disappearance

Mrs. Morphew disappeared on May 10, 2020. Plaintiff last saw her around 5:00 a.m. that day as he was preparing to leave their home in Chaffee County, Colorado for a previously scheduled landscaping job a few hours away in Broomfield, Colorado. Doc. 1 at 14. Around 3:00 p.m.

---

[1] A number of additional defendants have already been dismissed from the case with Plaintiff's consent. *See* Docs. 103, 126, 148.

that day, Plaintiff called and asked neighbors to go to his home and look for his wife because he and his daughters, who had been away on a road trip, were unable to reach her. *Id*. The neighbors could not find her and also did not see her mountain bike, which she rode almost daily. *Id*. Around 5:30 p.m., Plaintiff asked the neighbors to call the authorities while he packed up his things and drove back from Broomfield. *Id* at 15.

## II.    The Investigation

Shortly after law enforcement was contacted that evening, Mrs. Morphew's bike was discovered down a ravine off a dirt road near their home. *Id*. When Plaintiff arrived on the scene, he helped law enforcement try to track down his wife by providing them an article of her clothing for a scent dog. *Id*. The dog followed her scent to a river, where the scent disappeared. *Id*.

Suspecting that Plaintiff may have staged his wife's bicycle in the ravine to cover his tracks or to make it look like she had been abducted, law enforcement quickly began to focus on Plaintiff as the prime suspect in his wife's disappearance. *Id*. at 17. Investigators searched his residence, including vehicles parked in the garage. *Id*. at 18. They seized his truck and phone, his wife's car, and his daughters' phones. *Id*. They took DNA samples from his home as well as from his vehicle, his wife's vehicle, and the bicycle. *Id*. at 18. Over the course of the year leading up to his arrest, Plaintiff met with investigators more than sixty times. *Id*. at 19. He maintained his innocence throughout the investigation and still does. *Id*.

During the investigation, law enforcement discovered that Plaintiff's wife had been having an affair with another man for approximately two years prior to her disappearance. *Id*. They suspected that Plaintiff learned of this affair and became enraged. Doc. 1-1 at 59-66. They further theorized that he returned home from work on May 9, 2020,

around 2:30 p.m., chased his wife around the house, killed her using tranquilizer serum in a dart shot by a gun, disposed of her body and all evidence of the crime, and then created an alibi by going to Broomfield the next day, Sunday, May 10, 2020. Doc. 1 at 18.

## III.   The Arrest Affidavit

Despite not having discovered Mrs. Morphew's body,[2] the defendants, according to Plaintiff, crafted an investigation and prosecution to fit the preconception that he was guilty, rather than to objectively seek the truth. This culminated when prosecutors in Colorado's 11th Judicial District filed a misleading arrest affidavit. Doc. 1-1 at 1. This 129-page arrest affidavit, which outlined the prosecution's theory of the case, included many facts in support of its conclusion which do not appear to be disputed here, but also included a number of allegedly misleading assertions and omitted several potentially important exculpatory facts. This led to Plaintiff's arrest for the murder of his wife on May 4, 2021, and his subsequent months-long jailing before the charges were dismissed.

### A.   The Undisputed Inculpatory Facts

Law enforcement discovered a number of facts during the course of the investigation that supported its theory. While Plaintiff alleges that other exculpatory facts were overlooked and that the arrest affidavit ultimately charging him with murder fabricated additional evidence to

---

[2] Her remains were eventually found in September 2023. Thomas Piepert et al., <u>Suzanne Morphew's remains found 3 years after she went missing in Colorado. What happened to her?</u>, Associated Press News (Sept. 28, 2023, 4:53 PM), https://apnews.com/article/remains-found-missing-colorado-woman-suzanne-morphew-1ff32e64fe7d045b0359bb2a9fe6796b.

suggest his guilt, he does not dispute that the investigation yielded the following inculpatory facts:[3]

- Macy Morphew's admission that her parents argued a lot and that she feared they would separate or divorce. Doc. 1-1 at 6.

- Mrs. Morphew's sister, Melinda Baumunk, described Plaintiff as one who lives a double life, a liar, an adulterer, a bully, one that has to have control, cunning, fools people a lot, and treats his wife and daughters as trophies. *Id.* at 11.

- Mrs. Morphew texted her sister two days before she disappeared: "Its hard dealing with the harsh abrasiveness and having to show respect. He's also been abusive, emotionally and physically. There's so much…I went thru a period of acceptance and I feel more angry now. Anger at what I've allowed." *Id.* at 12.

- Mrs. Morphew kept a list of grievances about her husband on the notes application on her phone, which included "Phys abuse," "Stalking Sheila and me in house without telling," "Chase me around resort and threatened," "Took phone," "Not safe alone with you. Can't be trusted," "Oppressive," and "Accused me of bf." *Id.* at 13.

- Mrs. Morphew texted her husband a few days before she disappeared: "I'm done. I could care less what you're up to and have been for years. We just need to figure this out civilly." *Id.*

- Plaintiff declined to submit to a polygraph examination regarding his memory of the events leading up to his wife's disappearance and his alibi. *Id.* at 21.

- Investigators observed scratches on Plaintiff's upper left arm three days after his wife disappeared. *Id.*

- Plaintiff thought it was "very suspicious" that his wife would not tell him about some of her communications, even if he did not know she was involved in a sexual relationship with another man. *Id.* at 22.

---

[3]  I note that the following facts are all drawn from Plaintiff's complaint and arrest affidavit referenced in and attached to the complaint. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (court may consider documents that complaint incorporates by reference and documents attached as exhibits to complaint); *cf. Cuervo v. Sorenson*, 112 F.4th 1307, 1312-13 (10th Cir. 2024) (district court erred by relying on documents outside of the pleadings).

- Plaintiff's conflicting statements about whether he went on a hike to Fooses Lake with his wife the day before her disappearance. *Id.* at 125.

- Plaintiff's conflicting statements about whether he used his tranquilizer or darts in Colorado, including his admissions that "I've shot two deer with my tranq gun, 'cause I used to raise deer, and I collect horns" and that "I've shot deer from that little breezeway from between the garage and the laundry room." *Id.* at 23 n.32, 86.

- Plaintiff's admission that he used BAM, Telazol, and Xylazine as tranquilizers and that he brought these chemicals, which he knew to be controlled substances, from Indiana. *Id.* at 119.

- Retired Colorado Parks & Wildlife Field Veterinarian Lisa Wolfe's surprise that a civilian would have these animal tranquilizers. *Id.* at 129.

- Plaintiff's admission that he kept the tranquilizer chemicals in vials and injected them into darts himself. *Id.* at 119.

- Mrs. Morphew's "spy pen" recorded her husband listening to several episodes of "Forensic Files"—including three episodes about murders—during a drive to Pueblo less than two months before she disappeared. *Id.* at 29.

- Plaintiff was originally scheduled to pick up an employee to drive to Broomfield for a landscaping job around 5:30 p.m. on the day his wife disappeared but instead left at 5:00 a.m., twelve hours earlier than planned. *Id.* at 47.

- Plaintiff was seen "carrying unknown items in his hands and placing items into two separate trash cans located on the edge of the McDonald's lot between 10:19 AM and 10:41 AM" on May 10, 2020, roughly six hours after Mrs. Morphew was last seen alive. *Id.* at 36.

- Plaintiff was the last person to see his wife alive. *Id.* at 112 n.79.

- Plaintiff could not recall the items that were in the trash bags, stating that they were "probably old clothes" or boots. He could also not recall why he pushed the trash to the extent that his shoulder was in the trash can. *Id.* at 27, 37.

- Plaintiff suggested saying "I don't recall" was code for not wanting to tell the truth but himself didn't recall a number of critical facts surrounding his wife's disappearance. *Id.* at 67.

- Plaintiff began to liquidate the family's assets within a month of his wife's disappearance. *Id.* at 45-46.

- Plaintiff was an avid hunter and a professional landscaper and may have possessed the tools and expertise necessary to kill his wife, bury her body, and dispose of the evidence. *Id*. at 18.

- Plaintiff became intimately involved in a relationship with another woman in the months immediately following his wife's disappearance (before her body had been discovered). *Id*. at 123.

- Mrs. Morphew's father felt it was odd that neither of his granddaughters or Plaintiff were home on Mother's Day, when Mrs. Morphew disappeared, and that it was unusual that Plaintiff would choose to work on the Sunday of Mother's Day when he seldom worked on Sundays. *Id*. at 52.

### B.    The Exculpatory Facts

These facts, however, do not paint the whole picture. The investigation into Mrs. Morphew's disappearance also discovered facts that were inconsistent with the prosecution's theory and that would have tended to support the conclusion that his wife was abducted by a stranger. These include the following:

- Partial unknown genetic profiles were recovered from his wife's car and, using a national DNA database called CODIS, identified as potential matches to unsolved sex crimes committed in other states. Doc. 1 at 20-21.

- Unknown male DNA was found in a number of locations inside his home and on his wife's bike. *Id*. at 29-30.

- Plaintiff tried to contact his wife on the day she disappeared. *Id*. at 79.

- A K-9 detected his wife's scent near the scene of the abandoned bicycle. *Id*. at 85.

- A K-9 did not alert to the scent of a cadaver in their home or vehicles. *Id*. at 89.

- His hotel room in Broomfield may have smelled like chlorine because it was above an indoor pool (not because Plaintiff was destroying evidence, as the affidavit suggested). *Id*. at 100.

- His wife's phone and computer exhibited activity into the evening of May 9, suggesting that she was alive past the time investigators theorized he had killed her. *Id*. at 53-63.

- The plastic needle cap allegedly found by investigators in Plaintiff's dryer was actually a hypodermic needle cap, not a tranquilizer dart cap. *Id*. at 67.

- A tranquilizer gun is the only method by which to shoot a tranquilizer dart and Plaintiff's tranquilizer gun, which was stored in a locked gun safe, was inoperable and had not been used in a long time. *Id*. at 68-69.

None of these facts was mentioned in the affidavit submitted by prosecutors to the court.

The affidavit also included a range of allegedly fabricated and unreliable information in an attempt to bolster the inference that the evidence against Plaintiff was overwhelming. This included the following:

- A "pushpin map" that was used to suggest that Plaintiff was chasing his wife around the house on the afternoon of May 9, immediately before killing her. Investigators knew this map was unreliable because of a phenomenon called "static drift," which would have been a better explanation for why his phone was moving around the house so quickly. Doc. 1 at 38-46.

- Plaintiff's alleged admission that he was probably chasing a chipmunk in response to being confronted with the "pushpin map." Investigators also knew this admission was unreliable because it was made in response to fabricated and deceptive evidence. *Id*. at 44.

- Unreliable conclusions regarding his phone being in "airplane mode" on May 9. *Id*. at 46-52.

- Unreliable conclusions drawn from the "telematics" and odometer of his truck. *Id*. 87-89.

- The false statement that he knew about his wife's affair. *Id*. at 110.

- The false statement that he admitted to keeping tranquilizer chemicals on his work bench. *Id*. at 74.

- That his wife's bicycle was "discarded." *Id*. at 77.

- That his alibi was "created" to account for her disappearance. *Id*.

- That his tools were "staged" in the Broomfield hotel lobby. *Id*. at 82.

- That his wife "wanted out" of their marriage. *Id*. at 91.

- That his wife bought a spy pen for "safety" reasons. *Id*. at 93.

- That his wife's romantic partner refused to travel to Colorado because Plaintiff had security cameras all over the house. *Id*. at 95.

- That there was "suspected blood" near Plaintiff's garage. *Id*. at 97.

- That it was fair to assume his wife was dead because there were no records of her entering another country or using a credit card. *Id*. at 98.

- That he was having an affair. *Id*. at 100.

- That he used his Bobcat skid steer to dispose of his wife's body. *Id*. at 107.

- That he lied about having "steaks" for dinner with his wife the night before she disappeared. *Id*. at 114.

- That he "blamed" a mountain lion for his wife's disappearance. *Id*. at 116.

- That he "blamed" a turkey for why he was down by the creek while his wife was on the phone with her lover the afternoon before she disappeared. *Id*. at 117-18.

- That he used the "firing of a gun" to "describe" his violence towards his wife on the day she disappeared. *Id*. at 119.

- That he described his wife's breathing as "labored" the last time he saw her. *Id*. at 120.

- That he admitted to taking his wife's phone once or twice in the past to monitor what she was doing. *Id*. at 121.

The affidavit's case synopsis, which included these alleged fabrications, was prepared by investigator Alex Walker with the assistance of FBI Special Agent Jonathan Grusing. Doc. 1-1 at 2. The affidavit states it was reviewed and edited by FBI Special Agent Kenneth Harris as well as CBI Agents Joseph Cahill and Derek Graham. *Id*. It also states that the affidavit and warrant were reviewed by District Attorney Linda Stanley and Senior Deputy District Attorney Jeff Lindsey. *Id*. at 126.

## IV.   Procedural History

On May 2, 2023, after the charges against him were dismissed, Plaintiff filed the complaint in this case. In it, he brings claims under 42 U.S.C. § 1983 for (1) malicious prosecution, (2) fabrication of evidence, (3) arrest-affidavit violations under *Franks v. Delaware*, 438 U.S. 154 (1978), (4) conspiracy, (5) unlawful retention of property, (6) failure to intervene, (7) reckless investigation, and (8) municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). He also brings parallel state-law claims for malicious prosecution, fabrication of evidence, arrest-affidavit violations, conspiracy, and unlawful deprivation of property. Defendants subsequently moved to dismiss the case in seven separate motions. Docs. 87, 94, 95, 97, 98, 104, 108. A hearing was held on these motions on August 21, 2024. Doc. 157.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) requires a court to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will

not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). A court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* At this stage, the well-pleaded facts underlying a plaintiff's allegations must articulate a viable legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.

## DISCUSSION

The defendants named here were all involved in investigating, charging, and prosecuting Plaintiff to one degree or another. The allegations against them, if true, show an investigation and prosecution that was, in a number of senses, *wrongful*. Plaintiff alleges that prosecutors omitted significant evidence, failed to follow up on or answer questions that may have undermined the case against him, and misrepresented material facts. All are wrongful, and all undermine the criminal justice system in serious ways. There should be, and are, consequences for that conduct.[4] But civil liability for money damages is not necessarily one of those consequences. All of Mr. Morphew's asserted causes of action suffer from one or more legal deficiencies. Chief among those deficiencies is that, despite the failings of the investigation and prosecution, there was still probable cause to arrest and charge him with murder. For this and the other reasons set forth below, Plaintiff's claims must be dismissed.

---

[4]   Besides the implosion of the prosecution of Plaintiff and the need to restart the investigation into Mrs. Morphew's death, consequences can, and have, included sanctions both in court and through the professional oversight processes. *See, e.g.*, Doc. 159-1.

## I.    Probable Cause:
### Claims One, Two, Three, Four, Six, and Eight
### as to All Named Defendants

The core of Plaintiff's complaint and nearly all of his claims is that the affidavit that led to his arrest and prosecution was misleading, and he should not have been arrested. His claims for malicious prosecution, fabrication of evidence, *Franks* violations, conspiracy, failure to intervene, and *Monell* liability (except as to unlawful retention of property)[5] all turn on whether law enforcement had probable cause to arrest and charge him for his wife's murder in May 2021.[6] That is because each of these claims requires a showing that any misconduct by the defendants was material to a violation of Plaintiff's rights, or, in other words, that there would have been no probable cause to arrest and charge him had it not been for the alleged misconduct. *See Taylor v. Meacham*, 82 F.3d 1556, 1558 (10th Cir. 1996) (malicious-prosecution claim requires showing that there was no probable cause to arrest); *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) ("[A] plaintiff must assert a

---

[5]    Plaintiff's retention-of-property claim is addressed separately below.

[6]    As to Plaintiff's claim for "reckless investigation," there is something of a circuit split on whether such a cause of action should exist, with some courts recognizing the claim but others rejecting it. *See Parker v. City of Tulsa*, 745 F. App'x 79, 81 n.1 (10th Cir. 2018) ("As far as this court can tell, the Eighth Circuit stands alone in recognizing the existence of such a cause of action."). The Tenth Circuit, however, has not recognized any such constitutional claim. In the absence of any binding Supreme Court or Tenth Circuit precedent on point, I am persuaded by the majority of other courts that have held there is no such cause of action. *See Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (plaintiff cannot state a due-process claim "by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment"); *see also Parker*, 745 F. App'x at 81 n.1 ("[T]here exists serious reason to doubt the existence of [this] claim . . . ."). Plaintiff's Claim Seven is therefore dismissed.

- 12 -

causal connection between the fabrication of evidence and the deprivation of liberty."); *United States v. Moses*, 965 F.3d 1106, 1113 (10th Cir. 2020) (*Franks* claim requires showing that excluded information would have been material to a finding of probable cause); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990) ("[T]o recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights."); *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (a failure-to-intervene claim requires a preliminary showing that a government actor violated a plaintiff's constitutional rights); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1226 (10th Cir. 2020) (finding plaintiff's *Monell* claim failed because "he was arrested with probable cause"); *see also Kerns v. Bader*, 663 F.3d 1173, 1187 (10th Cir. 2011) (Finding probable cause to be the "easiest and most economical" piece "of common ground" to resolve a number of constitutional claims requiring "a variety of different elements").

In hindsight, it appears everyone involved now agrees that Mr. Morphew should not have been arrested, at least not at that time. As some defendants pointed out behind the scenes at the time, the investigation wasn't complete, there were loose ends to tie up, and there were too many questions to answer before a case against Plaintiff could be proved beyond a reasonable doubt. *See* Doc. 1 at 24 ("Defendants Cahill and Graham were highly critical of the affidavit and opposed the impending arrest of Barry, citing the need for more forensic testing, evidence collection, and review and analysis of the investigation and materials seized up to date."). But the question for this Court isn't whether the decision to arrest Plaintiff was wise or whether the government would have been able to prove its case to a jury beyond a reasonable doubt. The question is whether arresting and prosecuting him at that time was

unlawful. That depends on whether law enforcement had probable cause to arrest and charge him for his wife's murder, which is a significantly different inquiry.

### A.    Applicable Law

Probable cause is not a concept that can be reduced to percentages or formulas. It requires more than mere suspicion, but allows for reasonable doubts, and indeed does not even require showing that guilt is more likely than not. *See Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("Probable cause is not a precise quantum of evidence—it does not, for example, require the suspect's guilt to be more likely true than false. Instead, the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." (internal quotation marks omitted)). It requires far less than the "beyond a reasonable doubt" standard needed to convict, though more than "bare suspicion." *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) ("The probable-cause standard requires only a fair probability, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand." (internal quotation marks omitted)).

The probable-cause inquiry is an objective one, meaning it asks what a reasonable person in the circumstances would believe, not what any particular defendant or anyone else might have actually believed. *See, e.g.*, *Mglej v. Gardner*, 974 F.3d 1151, 1161 (10th Cir. 2020) ("[P]robable cause is measured by an objective standard."). In a case such as this where defendants are alleged to have fabricated evidence and omitted exculpatory facts from an arrest affidavit, the existence of probable cause is determined by ignoring the allegedly false information, accounting for the exculpatory omissions, and inquiring whether the accurate picture "would still have given rise to probable cause for the warrant."

*Taylor*, 82 F.3d at 1562. While this can be a question for a jury, it is not always. The Tenth Circuit has held, for example, that "whether an officer had probable cause to arrest [is] a 'proper issue for the jury if there is room for a difference of opinion.'" *Bruner v. Baker*, 506 F.3d 1021, 1028 (10th Cir. 2007) (quoting *DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990)). But where "the evidence supports only one conclusion, which is that the arrest of [the] plaintiff . . . was lawful because probable cause existed," it is proper for a court to resolve the question. *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985); *see also Easton v. City of Boulder*, 776 F.2d 1441, 1446 (10th Cir. 1985) (claims properly dismissed where there was "no basis upon which a jury could have reasonably concluded that" probable cause was lacking).

### B.   Analysis

Even including the facts that Plaintiff alleges were misleadingly omitted from the affidavit and setting aside those he says were wrongfully included or fabricated, no reasonable person could have looked at the allegations in it and found that probable cause was lacking. As alleged in the complaint and summarized above, the investigation developed hundreds of facts that support probable cause that Plaintiff does not dispute. Out of the 129-page arrest affidavit, Plaintiff only disputes the facts discussed in the background section above. Accepting, as I must at this stage of the case, that Plaintiff's allegations are true, there remains ample reason to find probable cause that he was involved in the murder of his wife.

Plaintiff is correct that the exculpatory information omitted from the arrest affidavit was material and may have undercut the prosecution's theory by supporting the alternative conclusion that his wife was abducted by a stranger. Particularly significant in this regard are the facts that unknown DNA swabbed from Mrs. Morphew's car potentially

- 15 -

matched DNA found in three out-of-state unsolved sexual assault inves-
tigations, that unknown male DNA was discovered in several places on
her discarded bike and in their home, and that her scent was found near
the area where her bicycle was found, possibly suggesting that this scene
was not staged. Doc. 1. at 20-21, 29-30, 85, 127.[7] These facts explain why
proceeding with the arrest and charges at the time the affidavit was filed
was at the very least unwise: the uncertainties raised by some of this
evidence would have made it very difficult for the prosecution to secure
a conviction at trial beyond a reasonable doubt, and prosecutors, gener-
ally, understand they have an ethical obligation not to bring charges
that they cannot prove beyond a reasonable doubt.

But as noted above, not every unwise decision is unconstitutional,
and the *legal* (if not ethical) standard for an arrest does not require the
same level of certainty as that for a conviction. The question here is not
whether the evidence was sufficient to show beyond a reasonable doubt
that Plaintiff murdered his wife, but whether the uncertainties raised
by the omitted and misrepresented evidence erased any substantial
probability that Plaintiff was involved. The evidence, even as presented
by the Plaintiff's complaint, still supports only one conclusion: that there
was such probable cause. *See Karr*, 774 F.2d at 1031 ("[W]e believe that

---

[7]  While it is not clear whether he considered the other exculpatory
omissions mentioned in the complaint, Judge Murphy, who presided
over the proof-evident-presumption-great hearing, expressly considered
the CODIS matches. The complaint states that Judge Murphy "specifi-
cally found that the unknown male DNA profile was 'particularly signif-
icant because while it doesn't prove a stranger abduction theory, it does
at least support it.'" Doc. 1 at 131. Yet Judge Murphy still found proba-
ble cause to arrest Plaintiff existed. *Id.* at 130. *See Stonecipher*, 759 F.3d
at 1141 ("A neutral magistrate judge's issuance of a warrant is 'the
clearest indication that the officers acted in an objectively reasonable
manner . . . .'").

the evidence supports only one conclusion, which is that the arrest of plaintiff Karr was lawful because probable cause existed.").

Accounting for the exculpatory omissions and leaving out the allegedly fabricated or misleading evidence Plaintiff depends on, the arrest affidavit would tell an objective observer the following:

- Plaintiff was controlling and both physically and emotionally abusive according to his wife. He was suspicious that she was cheating, at least emotionally, and they fought frequently. She didn't feel safe at home with him and tried to break up with him a few days before she disappeared.

- Plaintiff's behavior on the Sunday of her disappearance was unusual. He had a job planned in Broomfield and was supposed to pick up an employee at 5:30 p.m. to drive to Broomfield and stay overnight in a hotel that he had booked over a week in advance. But he instead left his house at 5:30 a.m. and drove to Broomfield alone. This was Mother's Day, and according to Plaintiff's father-in-law, it was strange that he would work the Sunday of Mother's Day, as he rarely worked on Sundays. He was observed throwing trash away in a McDonald's parking lot in Broomfield around 10:00 a.m. and when questioned couldn't remember what it was, stating it was "probably old clothes" or an old pair of boots. He tried to call and text his wife several times throughout this day.

- Plaintiff was the last person to see his wife alive. By his own admission, he was alone with her from the afternoon of May 9 until the morning of May 10, when she disappeared, and he would have had time to murder her and dispose of the evidence. His wife's computer and phone exhibited activity late into the evening of May 9, however, indicating she may still have been alive at that time.

- His memory regarding the events leading up to his wife's disappearance is fuzzy, and he gave conflicting statements about those events, including about whether they went on a hike together the day before her disappearance. He had scratches on his arm after she disappeared.

- He suggested that saying "I don't recall" is code for not wanting to tell the truth, but himself stated that he didn't recall a number of key events leading to his wife's disappearance.

- He has previously bought and used tranquilizer chemicals in darts that he filled himself. He had a tranquilizer gun, but it was not operable and hadn't been used recently. He gave conflicting statements about whether he had used the tranquilizer darts in Colorado. An expert was surprised that a civilian would have those tranquilizer chemicals.

- He started liquidating assets and seeing another woman shortly after his wife disappeared, long before her body was found.

- His wife's mountain bike was found in a ravine near their home, and dogs detected her scent in that area. Unknown male DNA was found on the bike, on the carpet by their bed and on a stair in their house, and in her car. The DNA from her car potentially matched that from unsolved sexual assault investigations.

- Cadaver dogs did not alert to Plaintiff's truck, and GPS data indicated that his Bobcat skid steer had not been moved since before his wife's disappearance.

- Plaintiff is a skilled hunter and a landscaper and may have had the tools and expertise to kill his wife, bury her body, and destroy the evidence.

On these facts, I find no room for debate that the relatively low bar of probable cause was met. That is not to say that the prosecution's theory was airtight, particularly at the time of the arrest. The excluded evidence, had it been included, indeed would have raised some doubts about others' possible involvement in Mrs. Morphew's death. But while those doubts may have been enough to acquit Plaintiff of a criminal charge, or even to permit debate about whether it was more likely than not (under that evidence) that he was guilty, neither of those questions is relevant to this case. Indeed, whether Plaintiff is actually guilty of murder is irrelevant here—the Constitution protects both the guilty and the innocent. But even with the full picture as Plaintiff has presented it in his complaint, there was still evidence that Plaintiff had a motive, means, and opportunity to kill his wife; that his alibi was fabricated (as it was uncorroborated and supported only by his own self-serving

statements); and that his credibility was dubious (given his conflicting statements to investigators).

While the full picture undermines the certainty expressed in the affidavit and might suffice to create some reasonable doubt, there remains far more than a "bare suspicion," and more than a "fair probability" that Plaintiff was involved in his wife's murder. *See Johnson*, 43 F.4th at 1107. By any reasonable, objective measure, this evidence goes well beyond the standard required for probable cause to arrest and charge Plaintiff for the murder of his wife.[8] *See, e.g.*, *Mallory v. Holdorf*, 575 F. App'x 108, 109 (4th Cir. 2014) (affirming district court's finding that probable cause existed to arrest plaintiff who was later acquitted of murdering his wife where he had an opportunity to commit the murder, witnesses heard him arguing with his wife, and plaintiff lacked credibility with investigators).

Did the investigators and prosecutors have an obligation to Plaintiff and the state courts to be more careful and candid? Yes. Did they fail to live up to that duty? By all appearances, yes.[9] Do the full facts as alleged

---

[8]   It is worth emphasizing, again, that it is not necessary that the evidence support only one possible conclusion about Plaintiff's guilt; that would be akin to proof beyond a reasonable doubt. *See United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) ("As the standard itself indicates, *probable* cause does not require metaphysical certitude or proof beyond a reasonable doubt.") (emphasis in original). Nor is it even necessary that the evidence support the conclusion that Plaintiff's guilt is more likely than not. *Johnson*, 43 F.4th at 1107. The question is whether the evidence is strong enough to raise a "fair probability" that Plaintiff was involved in the crime. *See United States v. Denson*, 775 F.3d 1214, 1220 (10th Cir. 2014). The evidence here, as in *Karr*, was sufficient to raise such a fair probability, so his arrest, while foolish and flawed, was not unlawful.

[9]   *See* Doc. 159-1 at 1-2 (disbarring District Attorney Linda Stanley in part because she "did not adequately supervise the prosecution of the case" against Plaintiff).

here raise some doubt about the theory presented in the affidavit and the certainty that Plaintiff was solely responsible for Mrs. Morphew's death? Yes. But do they eliminate even a "fair probability" that he was involved? The answer to that can only be no. For all its infuriating flaws, then, the prosecution of Plaintiff was not unlawful, and his Section 1983 claims for malicious prosecution, fabrication of evidence, *Franks* violations, conspiracy, failure to intervene, and *Monell* liability[10] must be dismissed on the basis of the existence of probable cause.

## II.    Claims Against Non-Prosecutorial Defendants in Their Individual Capacities

### A.    Causation and Personal Participation: Claims One, Two, and Three

Even if one assumes that the alleged misrepresentations in and omissions from the arrest affidavit obviated probable cause to arrest Plaintiff, there are other problems with his effort to state viable legal claims as to the non-prosecutorial defendants (Defendants Spezze, Rohrich, Camper, Himschoot, Cahill, Duge, Rogers, Graham, Koback, Lewis, and Schaefer). He has failed to directly link these defendants to his alleged injury, both as a matter of legal causation and because his allegations are insufficiently specific as to the role each played in causing his arrest. His claims for malicious prosecution, fabrication of evidence, and *Franks* violations against these defendants thus must be dismissed for this reason in addition to the existence of probable cause.

The injury Plaintiff alleges is being wrongfully arrested and then jailed and prosecuted. While the evidence does not support that assertion as explained above, even if it did, what caused it was the decision of the prosecutors to submit the arrest affidavit and move forward with

---

[10] Except as to unlawful retention of property, which is addressed below.

the case when and how they did. None of the allegations against these defendants shows that they played a material role in that action.

As to the investigation, the allegations are that defendants ignored exculpatory evidence and ginned up unreliable evidence to include in the affidavit. But the allegations are not that the prosecutors were misled by the investigators or duped into believing fabricated evidence. To the contrary, the allegations point to the prosecutors as ringleaders. *See*, *e.g.*, Doc. 1 at 21 ("[H]ighly exculpatory information was not disclosed in the affidavit for Arrest Warrant prepared by Defendants Walker, Stanley, Lindsey, Cahill, and other defendants and co-conspirators."). Most of the defendants are simply accused of not preventing the misleading information from being included in the affidavit (or the exculpatory information from being excluded), or not preventing the affidavit from being filed at all. *See, e.g., Id.* at 27 ("Even though only Defendant Walker subscribed and swore to the Arrest Affidavit, all Defendants identified above . . . personally participated in meetings and conversations and exchanged emails and other communications as participation in drafting of the Arrest Affidavit."). But those are all different ways of saying they failed to prevent the prosecutors from violating Mr. Morphew's rights. As explained below, failure to intervene was not recognized as a separate claim in these circumstances until after the events of this case. As to Claims One, Two and Three for malicious prosecution, fabrication of evidence, and *Franks* violations, the prosecutors took the action that injured Plaintiff, not the defendants who didn't stop them.

To be sure, if an investigator or officer conceals or misrepresents material facts to a prosecutor who then acts on that false information, a claim may be stated. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1292-93 (10th Cir. 2004) (finding that a plaintiff can state a claim for malicious prosecution against the district attorneys who filed charges as well as

"officers who conceal and misrepresent material facts to the district at-torney"). But that is not what is alleged in Plaintiff's complaint.

There is one possible exception, but even there the complaint stops short of asserting facts sufficient to support a claim. At times, Plaintiff seems to insinuate that Defendant Himschoot planted the hypodermic needle cap in Plaintiff's drying machine, but he never directly alleges that Mr. Himschoot planted evidence, only that he might have had the opportunity. *See, e.g.*, Doc. 1 at 19. While planting evidence likely would be the sort of allegation that, if it obviated probable cause, would suffice, the complaint is too oblique on this point to state a claim. The prosecu-torial defendants are therefore the only ones who could have been re-sponsible for any alleged injury.

Plaintiff also impermissibly uses group allegations against the non-prosecutorial defendants. Though he repeatedly asserts that various groups of defendants were responsible for his alleged injury, these alle-gations are often unaccompanied by factual support showing why each individual defendant is included in the group. *See Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) ("[I]t is particularly important . . . that the complaint make clear *who* is alleged to have done *what to whom*, to provide each individual with fair notice as to the basis of the claims against him.") (emphasis in original). At times, Plaintiff's allega-tions as to individuals actually contradict his allegations as to the groups in which those individuals are included. Plaintiff alleges, for ex-ample, that "Defendants who authored the Arrest Affidavit, individu-ally, jointly, and in conspiracy with one another . . . deprived Barry Mor-phew of his constitutional rights." Doc. 1 at 149. But he also admits, in-congruently, that Defendant Cahill, who is explicitly included in this group, was actively counseling against filing the arrest affidavit in May 2021. *See* Doc. 1 at 26, 42.

As to the arrest affidavit, many of the non-prosecutorial defendants are only alleged to have "edited" or "reviewed" this document. *See* Doc. 1-1 at 2 ("This affidavit was edited and reviewed . . . by CBI Agents Joseph Cahill and Derek Graham."). This is insufficient to show that these defendants caused the prosecutors to initiate a malicious prosecution based on material falsehoods or omissions, and it does not negate the fact that the prosecutors were ultimately responsible for submitting the affidavit they did. Though Mr. Morphew might have adequately pleaded his claims if he had alleged that the investigators and sheriffs concealed facts from the prosecutors, such as, for example, the exculpatory CODIS matches, that is not what he has alleged. To the contrary, the complaint is clear that the prosecutors were also aware of this evidence and simply chose not to include it in the affidavit they were responsible for authoring. *See*, *e.g.*, Doc. 1 at 129 ("Defendant Hurlbert was involved in numerous of the meetings and conversations about the CODIS matches."). That certain defendants "reviewed" and "edited" the affidavit before it was filed is insufficient to establish the causation necessary to state a claim in this context.

Other defendants are not even alleged to have reviewed the affidavit at all. Defendant Koback, for example, is only alleged to have known about certain exculpatory material that was omitted from the affidavit. *Id*. at 79. As with the other allegations regarding reviewing and editing the affidavit, this is insufficient to state a claim where it is not also coupled with the assertion that Mr. Koback actually concealed information or misled the prosecutors.

For these reasons, Mr. Morphew has failed to adequately allege that Defendants Spezze, Himschoot, Rohrich, Camper, Cahill, Duge, Rogers, Graham, Lewis, Koback, and Schaefer caused the injury that underlies

Plaintiff's malicious prosecution, fabrication of evidence, and *Franks* claims.

### B.    Qualified Immunity: Claim Six

Plaintiff's failure-to-intervene claim does not require a showing that each defendant legally caused his alleged injury. It only requires a showing that Plaintiff's rights were violated and that others, knowing of this violation, failed to intervene. *See Bledsoe*, 53 F.4th at 616. But until late 2022, failure-to-intervene claims were limited exclusively to the excessive-force context. *Id.* at 617; *see also Shaw v. Schulte*, 36 F.4th 1006, 1020 (10th Cir. 2022) (noting that the duty to intervene is limited to the excessive-force context and holding that Tenth Circuit law did not "clearly establish that an officer must intervene to prevent an illegal search and seizure"). Because all of the alleged misconduct here took place before then, all of the individual defendants (including the prosecutors) are entitled to qualified immunity on his failure-to-intervene claim, as none of their alleged actions would have violated a clearly established constitutional right at the time those actions took place. *Cuervo*, 105 F.4th at 1292 (qualified immunity applies if constitutional right violated was not "clearly established at the time of the violation").

### III.    Claims Against Prosecutorial Defendants in Their Individual Capacities

#### A.    Absolute Immunity: Claims One, Two, Three, Four, Five, and Six as to Defendants Stanley, Lindsey, and Hurlbert

Plaintiff's claims against the prosecutors (Defendants Stanley, Lindsey, and Hurlbert) therefore are better supported by the factual allegations in the complaint. But they must also be dismissed because they are blocked by the legal doctrine of absolute prosecutorial immunity. *See Mink v. Suthers*, 482 F.3d 1244, 1258 (10th Cir. 2007) ("Absolute

prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983.").

A prosecutor is "fully protected by absolute immunity when performing the traditional functions of an advocate." *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). Such functions include anything associated with the "judicial phase of the criminal process," as opposed to the investigative phase, and encompass "initiating a prosecution" and "presenting the State's case." *Imbler v. Patchman*, 424 U.S. 409, 431 (1976). The Tenth Circuit, moreover, has held that it is a "well-settled rule that prosecutors are entitled to absolute immunity for the malicious prosecution of someone whom [they] lacked probable cause to indict." *Warnick v. Cooley*, 895 F.3d 746, 752 (10th Cir. 2018) (internal quotation marks omitted). It has also held that "a prosecutor has absolute immunity from a civil damages suit, even if he deliberately withholds exculpatory information." *Hartz v. Campbell*, 680 F. App'x 703, 707 (10th Cir. 2017) (internal quotation marks omitted).

The allegations as to defendant prosecutors Stanley, Lindsey, and Hurlbert fall squarely within the ambit of prosecutorial function protected by absolute immunity. Despite the complaint's conclusory assertion that all "acts by Defendant DAs Stanley, Lindsey, and Hurlbert alleged herein were performed in an investigative and/or administrative phase of the case," the factual allegations show otherwise. *See Kalina*, 522 U.S. at 130 ("[T]he selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause required the exercise of the judgment of the advocate."). None of these three defendants is alleged to have done more than draft, review, and select which facts to include in the affidavit, and none is alleged to have acted as a complaining witness and personally vouched for the truth of facts included in the affidavit. *See Chilcoat v. San Juan*

- 25 -

*Cnty.*, 41 F.4th 1196, 1212 (10th Cir. 2022) ("A public prosecutor assumes the role of a complaining witness, and is not entitled to absolute immunity, when personally vouching for the truth of facts that provide the evidentiary basis for a finding of probable cause."). In fact, Plaintiff readily admits that "only Defendant Walker subscribed and swore to the Arrest Affidavit." Doc. 1 at 27; *see Chilcoat*, 41 F.4th at 1212 ("We have likewise observed the distinction between sworn and unsworn statements when deciding whether a prosecutor functioned as an advocate or a complaining witness."). Because Defendants Stanley, Lindsey, and Hurlbert are only alleged to have participated in the construction of the arrest affidavit in their roles as advocates for the County, they are entitled to absolute prosecutorial immunity.[11]

### B. Qualified Immunity: Claims One, Two, Three, Four, and Six as to Defendant Walker

Defendant Walker is not entitled to absolute immunity because he swore to the truth of the arrest affidavit and thus acted as a complaining witness. He is, however, entitled to qualified immunity.[12] Even assuming one could say the facts as alleged in the complaint arguably fall short of showing probable cause (and I do not think they could for the reasons

---

[11] Plaintiff argues that the doctrine of absolute immunity should be abolished. Perhaps. But that is not for a court at this level to say. It is well-established, binding precedent, and to the extend he argues I should ignore it, I am obliged to apply the law as it is, regardless of what I think it ought to be.

[12] Even if Plaintiff's complaint adequately alleged causation and personal participation as to the non-prosecutorial defendants and failure to intervene was a clearly established legal claim at the time, and even if the prosecutors were not entitled to absolute immunity, the non-prosecutorial defendants and the prosecutors would all still be entitled to qualified immunity for the exact same reasons explained in this section as to Defendant Walker.

discussed above), qualified immunity would still apply to Mr. Walker because that conclusion is not so obvious that any reasonable official in his position would have believed that the alleged fabrications and omissions were immaterial to a finding of probable cause. *See A.M. v. Holmes*, 830 F.3d 1123, 1140 ("in the § 1983 qualified-immunity context, an officer may be mistaken about whether he possesses *actual* probable cause to effect an arrest, so long as the officer's mistake is reasonable—*viz.*, so long as he possesses 'arguable probable cause'" (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007) (en banc))). That is because the facts, even as alleged, still show that Plaintiff had a motive and an opportunity to kill his wife, dubious credibility, and a suspicious alibi. That is enough to entitle Mr. Walker to qualified immunity on the claims raised in the complaint. *See Stonecipher*, 759 F.3d at 1141 (defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff").

## IV. Conclusory Allegations: Claims Four and Five as to All Named Defendants

### A. Claim Four – Conspiracy

Plaintiff's conspiracy claim also fails as to all named defendants because it is supported only by conclusory allegations. To properly plead a claim for conspiracy, a plaintiff must allege "specific facts showing an agreement and concerted action among defendants." *Bledsoe*, 53 F.4th at 609. He does not do so here. He instead relies wholly on conclusory allegations, like that defendants "conspired . . . to manufacture probable cause that [Plaintiff] committed murder." Doc. 1 at 124. He does not allege any facts that would tend to show the defendants entered into an agreement to deprive Plaintiff of his constitutional rights. He generally posits that "defendants worked closely together, sharing information,

[and] strategizing," but does not explain why this allegation amounts to evidence of a conspiratorial agreement as opposed to the standard collaboration of investigators and law-enforcement officials doing their jobs.[13] *Id.* He alleges many instances of parallel conduct, but the Tenth Circuit and Supreme Court have both held that "an allegation of parallel conduct absent context implying a meeting of the minds 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Gee*, 627 F.3d at 1183 (quoting *Twombly*, 550 U.S. at 557, and holding this standard is not limited to the antitrust context). Indeed, the complaint includes various allegations showing that there was no meeting of the minds as to at least a number of the defendants. *See, e.g.*, Doc. 1 at 42. Plaintiff's conspiracy claim therefore fails as a matter of law and is subject to dismissal for this reason, in addition to the existence of probable cause.

### B.  Claim Five – Unlawful Retention of Property

Plaintiff's claim for unlawful retention of property is grounded in legitimate concerns about the ability of the state to retain his property indefinitely. *See U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1213 (10th Cir. 2001) ("After the criminal proceedings conclude, however, the government has no right to retain the property as evidence, absent the commencement of forfeiture proceedings, and its continued retention of the property from that point forward could legitimately be viewed as a deprivation of the defendant's due process rights."). The claim fails at this point, however, because his allegations are either conclusory or not

---

[13] Plaintiff also does not explain how all defendants could have been engaged in a conspiracy when, as mentioned above, some defendants were actively counseling against charging him at the time the arrest affidavit was filed.

sufficient to explain how the state process for seeking return of confiscated property is unconstitutional.

Plaintiff admits, on the one hand, that "On May 6, 2022, four days after the Complaint was filed in this case, Morphew filed a motion for return of property in the Fremont County District Court." Doc. 134 at 11. He notes that this motion was opposed by two of the prosecutors named as defendants in this case, that there was a hearing on October 25, 2022, and that the state district court ordered his property not to be returned "because the property had been seized pursuant to a search warrant." *Id.* He then asserts, on the other hand, that "Colorado's purported post-deprivation procedures do not satisfy due process because, after a trial court lacks subject matter jurisdiction over the criminal case, the court has no jurisdiction to rule on a motion to return property." *Id.* at 12. While it may be that he could state a claim in this context if his property request were denied on these jurisdictional grounds, his allegations are not clear enough to do so at this stage. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (intentional deprivations of property violate the Due Process clause if adequate state post-deprivation remedies are not available). He has not, for example, attached a copy of the state-court order that might show the basis for that court's decision—or the process he was afforded. Given this, all that supports this claim are conclusory assertions that the County's process is inadequate, along with his contradictory allegation that he was afforded a hearing on his request. For this reason, his retention-of-property claim is dismissed as insufficiently pled.

## V. Claims Against Entity Defendants and Stanley and Spezze in Their Official Capacities: Claim Eight

As with his claim for conspiracy, Plaintiff's assertions in support of municiapal liability are conclusory.[14] He claims *Monell* liability on failure-to-train and failure-to-supervise theories, but he fails to allege with any specificity what training or supervision was not provided or why what was provided was insufficient. He also does not give examples of similar constitutional violations by the County, Sheriff's Department, or DA's office in other cases. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for the purposes of failure to train.").

His allegations as to policy and custom are similarly lacking. Plaintiff again simply recites the elements of this form of liability without actually pointing to a specific policy or custom to substantiate his claim. He argues that his inability to identify policy, custom, lack of training, or lack of supervision with specificity is due to the fact that he "has been unable to conduct discovery." Doc. 134 at 14. But this argument has repeatedly been rejected. *See, e.g., Frazier v. Jordan,* No. 06-1333, 2007 WL 60883, at *6 (10th Cir. Jan. 10, 2007) (affirming dismissal where plaintiff admitted "he could only make assumptions as to relevant policies or customs because he was denied discovery on this issue" but "fail[ed] to describe any policy or custom in place"). Plaintiff's allegations on these points are conclusory and insufficient to state claims.

---

[14] In this context, claims against defendants in their official capacities are treated as claims against the corresponding entity or municipality. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Plaintiff's allegations as to ratification and final policymaking authority are also conclusory. He offers no factual averments demonstrating that the alleged final policymakers actually exercised that authority in this case. And as to ratification he simply offers more conclusory allegations—allegations that do not suffice to provide the factual context necessary to state a claim under the law in this context. *See Bryson v. Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010) ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."). Plaintiff's claims as to municipal liability are therefore dismissed for this reason in addition to the fact that he has not adequately pled any underlying constitutional violation for the reasons discussed above.

## VI.  Claims Against Doe Defendants: All Claims

Plaintiff's complaint purports to assert claims against "John/Jane Does 1-10, and other unknown employees of the Eleventh Judicial District Attorney, and other unknown officers of the Chaffee County Sheriff's Department." Doc. 1 at 2. Claims against unnamed defendants may be dismissed if the plaintiff's allegations "are vague and fail to meet the pleading standards under . . . *Twombly*, 550 U.S. 544." *Culp v. Williams*, No. 10-cv-00886-CMA-CBS, 2011 WL 1597686, at *3 (D. Colo. Apr. 27, 2011), *appeal dismissed as frivolous*, 456 F. App'x 718 (10th Cir. 2012). Such is the case here, as Plaintiff's complaint contains no specific factual allegations as to what the unnamed defendants did or failed to do that would support a cause of action against them; indeed, the complaint does not even identify what cause or causes of action is or are asserted against the unnamed defendants. *See generally* Doc. 1. Plaintiff's claims against the Doe defendants and other unknown defendants must therefore be dismissed. *Cf. Sweets v. Wyo. Dep't of Emp't*,

589 F. App'x 887, 890 (10th Cir. 2014) (affirming dismissal of unnamed defendants where complaint "contained no facts showing that they had personally participated in any constitutionally impermissible conduct"); *McNees v. Ocwen Loan Servicing, LLC*, No. 16-cv-01055-WJM-KLM, 2017 WL 1386360, at *7 (D. Colo. Feb. 16, 2017) (R. & R.) (recommending dismissal of claims against unnamed defendants where claims relied on same underlying factual allegations asserted against named defendant, against whom plaintiff had failed to state a claim), *adopted by* 2017 WL 1390676 (D. Colo. Mar. 15, 2017); *Jensen v. Nucor Corp.*, No. 1:21-CV-00100-DAK-JCB, 2021 WL 4748453, at *2 to *3 (D. Utah Oct. 12, 2021) (dismissing unnamed defendants where plaintiff "fail[ed] to sufficiently describe" and "failed to provide any allegations relating to" them); *Silva v. US Bank, Nat'l Assoc.*, 294 F. Supp. 3d 1117, 1134-35 (D. Colo. 2018) (R. & R.) (recommending dismissal without prejudice of Doe defendants where all claims against named defendants were dismissed), *adopted by* No. 17-cv-1529-WJM-KLM, 2018 WL 10561514 (D. Colo. Mar. 19, 2018).

## VII. Subject-Matter Jurisdiction Over State-Law Claims: Claims Nine, Ten, Eleven, Twelve, and Thirteen

Having granted the defendants' motions to dismiss as to all of Plaintiff's federal claims, I decline to exercise jurisdiction over his state claims. *See* 28 U.S.C. § 1367(c)(3); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

## CONCLUSION

Plaintiff, like anyone accused of a crime, deserves better than what happened here. The People of the State of Colorado, on whose behalf and in whose name the charges against Plaintiff were brought, deserved

better. And Suzanne Morphew certainly deserved better. Perhaps Plaintiff is right that immunity doctrines ought to be revisited and it should be easier to sue those who mishandle prosecutions like this for damages in federal court. But that is a question for another day and another court. This court must apply the law as it is, and that requires the motions to be granted and the Plaintiff's claims to be dismissed.

Therefore, it is **ORDERED** that:

the motions to dismiss, **Docs. 87, 94, 95, 97, 98, 104, 108**, are **GRANTED**, and all claims are **DISMISSED WITHOUT PREJUDICE**.

DATED: September 24, 2024          BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge

- 33 -

# ATTACHMENT   B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01108-DDD-JPO

BARRY MORPHEW,

     Plaintiff,

v.

CHAFFEE COUNTY, Colorado;
BOARD OF COUNTY COMMISSIONERS OF CHAFFEE COUNTY, Colorado;
CHAFFEE COUNTY SHERIFF'S DEPARTMENT;
LINDA STANLEY, District Attorney, in her official and individual capacities;
JOHN SPEZZE, Chaffee County Sheriff, in his official and individual capacities;
ALEX WALKER, Eleventh Judicial District Attorney's Office Investigator;
JEFFREY LINDSEY, Deputy District Attorney;
MARK HURLBERT, Deputy District Attorney;
ANDREW ROHRICH, Chaffee County Undersheriff;
JOHN CAMPER, Colorado Bureau of Investigation Director;
SCOTT HIMSCHOOT, Chaffee County Sheriff's Deputy;
JOSEPH CAHILL, Colorado Bureau of Investigation Agent;
MEGAN DUGE, Colorado Bureau of Investigation Agent;
CAITLIN ROGERS, Colorado Bureau of Investigation Agent;
DEREK GRAHAM, Colorado Bureau of Investigation Agent;
KEVIN KOBACK, Colorado Bureau of Investigation Agent;
KIRBY LEWIS, Colorado Bureau of Investigation Agent;
CHRIS SCHAEFER, Colorado Bureau of Investigation Deputy Director of Investigations;
and JOHN/JANE DOES 1-10, and other unknown employees of the Eleventh Judicial
District Attorney, and other unknown officers of the Chaffee County Sheriff's
Department,

     Defendants.

---

FINAL JUDGMENT

---

     In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is entered.

1

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order, filed September 24, 2024, by the Honorable Daniel D. Domenico, United States District Judge, and incorporated herein by reference as if fully set forth, it is hereby

ORDERED that judgment is hereby entered in favor of Defendants and against Plaintiff, on Defendants' motions to dismiss. It is further

ORDERED that Plaintiff's complaint and action are dismissed without prejudice.

DATED at Denver, Colorado this 24th day of September, 2024.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK


s/ Robert R. Keech
Robert R. Keech,
Deputy Clerk

2